# Exhibit A

*Deposition of Detective Upchurch,
September 29, 2025*

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA

STATE OF FLORIDA,          )
          Plaintiff,       )
                           )
                           )
   vs.                     ) Case No. 2025-CF-2088
                           )
                           )
MICHAEL PHILIP BRACKNELL,  )
          Defendant.       )
_____ )


DEPOSITION OF MORGAN UPCHURCH


DATE TAKEN:       September 29, 2025


TIME:             4:12 p.m. to 4:31 p.m.


PLACE TAKEN:      Videoconference (Zoom)


BEHALF OF:        The Defendant


REPORTED BY:      Brittany Bridges, CER
                  Contract Court Reporter
                  Twentieth Judicial Circuit
                  Florida, and Notary Public.


_____

MIKULICE REPORTING SERVICES
Courtney Building, Suite 201
2069 First Street,
Fort Myers, Florida 33901
OFFICE (239)334-6545

ORIGINAL

2

A P P E A R A N C E S


For the Plaintiff:

    Victor Jusino, Assistant State Attorney
    Office of the State Attorney
    38053 Live Oak Avenue
    Dade City, Florida 33523

For the Defendant:

    Pavlina Petrova, Esquire
    Regional Conflict Counsel
    13815 US 98 Bypass
    Dade City, Florida 33525




_____

I N D E X

                                                PAGE
    Direct Examination by Ms. Petrova            4

(Videoconference Deposition commenced at 4:11 p.m.)

THE REPORTER:  Okay.  Everyone, we are currently on the record.  Today is Monday, September 29, 2025.  It's currently 4:11 p.m.  My name is Brittany Bridges.  I'm the court reporter and Florida notary.  We're here for the deposition of Mr. Morgan Upchurch.  Prior to going on the record, Mr. Up -- Mr. Upchurch presented his Florida driver's license, and I was able to confirm his identity that way.  At this time, we'll take appearances for the record, beginning with the State.

MR. JUSINO:  Victor Jusino on behalf of the State.

MS. PETROVA:  Pavlina Petrova, Office of the Regional Counsel for Michael Bracknell.

THE REPORTER:  Thank you.  And then Mr. Upchurch, will you say and spell your first and last name for the record?

THE WITNESS:  My name is Morgan Upchurch, M-O-R-G-A-N, last name, U-P-C-H-U-R-C-H.

THE REPORTER:  Thank you, sir.  And would you go ahead and raise your right hand?  Do you solemnly swear or affirm the testimony you're about to provide in this matter will be the truth, the whole truth, and nothing but the truth?

4

THE WITNESS:  I do.

THE REPORTER:  Thank you, sir.  And Counsel, you may proceed.

MORGAN UPCHURCH,

Having been first duly sworn, was examined and

testified under oath as follows:

DIRECT EXAMINATION

BY MS. PETROVA:

Q.  Okay.  We're here for the deposition in Case Number 25CF2088, State v. Michael Bracknell. Detective, tell me, please, where are you employed?

A.  With the Zephyrhills Police Department.

Q.  For how long?

A.  Almost 12 years.

Q.  And now you're a detective, right?

A.  Correct.

Q.  Were you a detective back on May 15, 2025?

A.  Yes, ma'am.

Q.  Okay.  You were involved in this incident, and you wrote the police report.  Did you have a chance to review it?

A.  I have.

Q.  Is the police report accurate?

A.  Yes, ma'am.

Q.  Is it complete?

5

A.    Yes, ma'am.

Q.    Is there anything that you would like to delete from the report?

A.    No, ma'am.

Q.    Is there anything that you would like to add to the report?

A.    No, ma'am.

Q.    How did you get involved in the incident?

A.    I was in communication with Detective Chimeri at the time.  We work on a unit together on the special response team.  Myself, Detective Chimeri, and K-9 Officer Limoges.

Q.    When you say special response, he -- tell me more about that.

A.    Basically, our -- our primary focus is like a street crimes unit, like we're a proactive unit.

Q.    So, like, let's say you go to work and you're starting the shift, do you discuss what you're going to do that day?

A.    It's -- it's basically -- we basically do the same things almost every day as we get to work and we meet up, and we go out, and we start driving around and conducting traffic stops on violations that we observed and go from there.

Q.    Do you -- do you sometimes decide in advance

a person that you will target?

A.    If we see a person, like, we might discuss -- like, we hear something, and we might discuss like, oh, look for this person, or, oh, there's something going on in this area.  Like, we might go to that area, like, if there's a trend going on.  But that's basically it.

Q.    But if you hear something like -- like a specific person is involved in criminal activity, that's what you mean, right?

A.    Correct.

Q.    Okay.  What about that day?  Did you have anything set in advance for Mr. Bracknell?

A.    I honestly don't recall if we did or not.  I don't -- we see him quite often.  Like, we see him riding around.  We know him.  I can remember that guy since the day I -- almost one of the first days that I started at the Police Department.

Q.    Okay.  Tell me now how -- how the day proceed.  What did you notice?

A.    Well, I -- I observed Mr. Bracknell on his scooter leaving the Wawa and he ran a stop sign that's on the north side of Wawa coming out onto County Road 54 and then he drove from there towards the Kangaroo gas station that's across 50 -- from 54 from the Wawa.

Q.    You -- were you by yourself in your vehicle?

A.    I had my sergeant with me.  She was with me. Detective Chimeri was in his own vehicle, and then K-9 Officer Limoges was in his own vehicle.

Q.    And who is your sergeant?

A.    Alissa Little.

Q.    Okay.  Once you observe Mr. Bracknell committing the traffic infractions, what did you do?

A.    I informed Detective Chimeri who then -- he said he observed him run the stop sign coming out onto 301 from the Kangaroo gas station.  And then he went west across 301 onto the access road that's called Main Street that runs along 301 and he was continuing northbound.  I then went up 301 and then I observed him run the stop sign that's in front of the Quality Inn and in front of the Ameri Wash as well on 301.

Q.    So how many -- how many stop signs you observed him to run?

A.    Three.

Q.    Three.  Okay.  What happened after that?

A.    After that, we know that Mr. Bracknell is known for fleeing from law enforcement.  So we're -- we communicated with each other it was best to wait until he, like, got to kind of a spot to where he couldn't run away from us if we did conduct a traffic stop, if

we were able to conduct a traffic stop.  So he had turned down Sylvan Lane, which is off of Daughtery Road, and there's not really a whole lot of places to run there.  So that's where we conducted the traffic stop.

Q.   Did you conduct the traffic stop or Detective Chimeri did?

A.   We kinda both did at the same time.  We -- he was right behind me, and I turned my lights on.  And then he kind of went over to the side and turned his lights on as well.

Q.   Okay.  What happened after you turned your lights on?  What did you do?

A.   We informed him of the reason for the stop, and he was being kind of argumentative about it.  And then Detective Chimeri went to his vehicle to do a -- a wants and records check and a -- over the -- using -- using the radio to see if he had any warrants or anything while K-9 Officer Limoges did a K-9 sniff on the -- on his scooter.

Q.   Did you -- did you start writing any traffic citations for the infraction?

A.   I did not.  I did not.

Q.   Did you observe Officer Limoges doing that -- the air sniff with his K-9 around the scooter?

9

A.   I did not.  I was focusing on speaking with Mr. Bracknell.

Q.   At that time, Mr. Bracknell was not a threat to anyone, right, at that time?

A.   At the time, I -- that's why I stayed in direct contact with him to make sure that, like, he didn't flee or, you know, he didn't have a chance to, like, maybe pull, like, a weapon or anything out on us. I -- I -- something like that.

Q.   He was calm, eating food -- eating chicken nuggets?

A.   He -- he was eating food, but he was kind of irritated -- was irritated.  He was definitely irritated.

Q.   He was on the phone -- you let him use the phone, right?

A.   Correct.

Q.   You personally didn't -- didn't observe any weapons on Mr. Bracknell at that time, right?

A.   None that I could see.

Q.   All right.  And you personally didn't observe any bulges -- suspicious bulges that you can see?

A.   I did not, but he was wearing baggy clothing.

Q.   I understand that.  And you personally didn't have a reason to believe that he's armed, right?

A.   I -- I treat everybody as if they are armed.

Q.   How come?

A.   Because you never know who's armed.  This is Florida.  Everybody has -- most everybody has a weapon.

Q.   Wow.  You didn't observe, at that time, Mr. Bracknell committing any criminal activity aside from the traffic infractions, right?

A.   Just traffic infractions at that moment, yes, ma'am.

Q.   Okay.  Did you make the decision for Officer Limoges to search the defendant?

A.   I did not.

Q.   And were you present during the search of the defendant?

A.   Yes, ma'am.  I was off to the side as he conducted --

Q.   Tell me -- okay.  On which side of Officer Limoges?

A.   I believe it would have been the left side of him if I remember correctly.

Q.   Tell me, please, what did you observe initially?

A.   I just observed K-9 Officer Limoges start conducting a pat -- search of him.  And then --

Q.   That -- and from time to time I may stop you.

11

This is just to clarify, not to forget, not to being rude. When you say pat search, what does it mean exactly? What is pat search?

A. Well, a pat search is you feel on the -- the outside of the clothing. You feel down. You pat down to ensure there are no weapons. And I observed that. And then I observed K-9 Officer Limoges speaking to Mr. Bracknell. I couldn't hear everything they were saying because where I -- I was staying -- I know that's where I was standing. I was standing near the front of the truck, which, if you hear in the video, is very loud. So I really couldn't hear their dialect -- what they were saying.

But at that time, K-9 Officer Limoges had went down towards one of his lower pockets on his left side and had a -- a little, like, film tube case. And then I heard Mr. Bracknell say that it was Viagra when he pulled it out of his pocket.

Q. Okay. So -- so you heard -- a -- and -- and let me see if I got this right. You can't -- you couldn't hear everything because it was noise.

A. Um-hum.

Q. But Officer Limoges went down to his left pocket --

A. Um-hum.

12

Q.   -- and heard that -- and took the pill bottle?

A.   It's -- you know, remember, like, the -- it kind of looked like one of those -- remember the -- the little tubes that, like, film -- like -- like, photograph film you used to drop off?

Q.   Yes.  Yes.  Yes.

A.   Remember those little cases?

Q.   Yes.

A.   That's kind of what it looked like that he pulled out of his pocket.  And when -- when he pulled it out of his pocket, Mr. Bracknell said that it was Viagra inside of it.

Q.   Okay.  So actually at that time, Officer Limoges put his hand inside Mr. Bracknell's pocket, right?  Not just patting down?

A.   Correct.

Q.   And what happened after that?

A.   Well, after that, we -- I looked inside of the film tube case that he said he had Viagra in it. And I looked inside of it and there were several blue pills inside of it.  Some were circle -- circular, some were like a diamond shape, which is consistent with Viagra, which you have to have a prescription for.  So at that time, K-9 Officer Limoges then continued a

13

search -- a full search of his person.  And I -- sorry.

Q.   Why was Officer Limoges putting his hands inside his pocket prior to that?

MR. JUSINO:  Objection.

MS. PETROVA:  Wasn't it a pat down?

MR. JUSINO:  Objection, calls for speculation.  He's not Officer Limoges.

MS. PETROVA:  If he knows.

MR. JUSINO:  You can answer -- you can answer.  If he knows.

MS. PETROVA:  Right.

MR. JUSINO:  Well, I gotta put my objection on the record.

MS. PETROVA:  Why, sure.

THE WITNESS:  Okay.  Officer Limoges later informed me that -- he later on had informed me the reason he did go in his pocket is because Mr. Bracknell informed him that he had a knife in his pocket.

BY MS. PETROVA:

Q.   Did you personally hear Mr. Bracknell telling Officer Limoges that has knife in his pocket?

A.   I did not hear that.  No, I did not.  Like I said, because I was on the louder side of the vehicle at that time.

Q.   Any weapons found on Mr. Bracknell?

14

A.    I don't recall.

Q.    It would be -- if they're found, it would have been in property, right?

A.    I believe so.

Q.    Do you recall if any knives are found on him?

A.    I don't -- I don't recall that -- if there were or not.

Q.    And if was found it would have been in -- in property, right?

A.    Yes.

Q.    And maybe I asked you, you personally didn't write any traffic citation to Mr. Bracknell, right?

A.    I did not, no, ma'am.

Q.    I -- that I have an address.

    (Ms. Petrova is having connectivity issues)

A.    I'm sorry.  Could you say that again?  You broke up.

Q.    Is there anything else that you have done in this case that I haven't addressed?

A.    No, ma'am.

Q.    Did -- for any reason, did Mr. Bracknell make any statements to you?

A.    Not that I recall.  Oh, I wanted to add about with the Viagra part.  I didn't ask him -- I did ask him if he had a prescription for Viagra, and he told me

15

he did not.

MS. PETROVA:  I have no more questions. Victor?

MR. JUSINO:  No, thank you.  Read or waive, Detective?

THE WITNESS:  Read.

THE REPORTER:  Okay, sir, what email address would you like that sent to?

MS. PETROVA:  Detective, read at trial or before trial when it's to be transcribed?

THE WITNESS:  I would prefer before, but I mean, either one.

MR. JUSINO:  That's fine.  You have that right.

MS. PETROVA:  Oh, sure.

THE REPORTER:  Okay.  Sir, what email address would you like that sent to?

THE WITNESS: MUpchurch@police.zephyrhills.fl.us.

THE REPORTER:  Okay.  I got it.  I'll go ahead and get us off the record.

MS. PETROVA:  Thank you.  Thank you for coming.  Have a nice afternoon.

THE WITNESS:  Yes ma'am.  You, too.

(Off the record at 4:31 p.m.)

16

Mikulice Reporting Services
2069 First Street, Suite 201
Fort Myers, Florida 33901
(239)334-6545

Date: October 17, 2025

MORGAN UPCHURCH
MUpchurch@police.zephyrhills.fl.us.
RE:                    STATE OF FLORIDA   vs. MICHAEL PHILIP
                       BRACKNELL
DEPO OF:               MORGAN UPCHURCH
DATE TAKEN:            September 29, 2025
LOCATION:              Videoconference (Zoom)

Dear Mr. Upchurch,

Your deposition taken in the above-styled case has been transcribed.

Please come to our office located at 2069 First Street, Suite 201, Courtney Building, Fort Myers, FL 33901 in order to complete the reading and signing of the transcript.

Our office hours are from 8:30 a.m. to 4:00 p.m. Monday - Friday.  Please allow time to complete before 4:00 p.m.

Your prompt attention to this matter in appreciated.  If you have not appeared within 10 days from the date of this letter, we shall conclude that you have waived the reading and signing of the deposition transcript.

Sincerely,

_____
Brittany Bridges
Court Reporter

17

ERRATA SHEET

STATE OF FLORIDA
vs.
MICHAEL PHILIP BRACKNELL
        DEFENDANT.

CASE NO.          2025-CF-2088
DEPOSITION OF:    MORGAN UPCHURCH


PAGE NO.   LINE NO.      CORRECTION OR CHANGE

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____


Under the penalties of perjury, I declare that I have

read the foregoing document and that the facts stated in

it are true.



SIGNATURE:_____DATE:_____
           MORGAN UPCHURCH

18

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, the undersigned authority, certify that MORGAN UPCHURCH, appeared before me via videoconference and was duly sworn.  WITNESS my hand and official seal this 29th day of September, 2025.


_____

Brittany Bridges, CER

Notary Public - State of Florida

My Commission No. HH230969

Expires: 2/20/2026

19

<u>REPORTER'S CERTIFICATE</u>

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH


I, Brittany Bridges, do hereby certify that the deposition of MORGAN UPCHURCH was produced into a verbatim transcript in accordance with all state rules and laws for the State of Florida.  I further certify the testimony contained in this transcript was produced from an audio recording and is a true and accurate transcript to the best of my ability.

_____

BRITTANY BRIDGES, CER

Notary Public - State of Florida

My Commission No. HH230969

Expires:  02/20/2026