# Exhibit B

*Deposition of Detective Chimeri,*
*September 29, 2025*

1

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA

STATE OF FLORIDA,            )
          Plaintiff,         )
                             )
                             )
   vs.                       ) Case No. 2025-CF-2088
                             )
                             )
MICHAEL PHILIP BRACKNELL,    )
          Defendant.         )
_____ )


DEPOSITION OF STEVEN CHIMERI


DATE TAKEN:        September 29, 2025


TIME:              2:57 p.m. to 3:25 p.m.


PLACE TAKEN:       Videoconference (Zoom)


BEHALF OF:         The Defendant


REPORTED BY:       Brittany Bridges, CER
                   Contract Court Reporter
                   Twentieth Judicial Circuit
                   Florida, and Notary Public.


_____

MIKULICE REPORTING SERVICES
Courtney Building, Suite 201
2069 First Street,
Fort Myers, Florida 33901
OFFICE (239)334-6545



2

A P P E A R A N C E S

For the Plaintiff:

    Victor Jusino, Assistant State Attorney
    Office of the State Attorney
    38053 Live Oak Avenue
    Dade City, Florida 33523

For the Defendant:

    Pavlina Petrova, Esquire
    Regional Conflict Counsel
    13815 US 98 Bypass
    Dade City, Florida 33525

_____

I N D E X

|  | PAGE |
|---|---|
| Direct Examination by Ms. Petrova | 4 |
| Cross-Examination by Mr. Jusino | 18 |
| Redirect Examination by Ms. Petrova | 20 |

3

(Videoconference Deposition commenced at 2:57 p.m.)

THE REPORTER:  Okay.  Everybody.  We are currently on the record.  Today is Monday, September 29, 2025.  It's currently 2:57 p.m.  My name is Brittany Bridges.  I'm the court reporter and Florida notary.  We're here for the deposition of Mr. Steven Chimeri.  Prior to going on the record, Mr. Chimeri did present his Zephyrhills Police identification, and I was able to confirm his identity that way.  At this time, we'll take appearances for the record, beginning with the State.

MR. JUSINO:  Victor Jusino on behalf of the State.

MS. PETROVA:  Pavlina Petrova, Office of the Regional Counsel for Michael Bracknell.

THE REPORTER:  Thank you.  And then Mr. Chimeri, will you say and spell your first and last name for the record?

THE WITNESS:  Detective Steven Chimeri, S-T-E-V-E-N, last name, C-H-I-M as in Mike, E-R-I.

THE REPORTER:  Thank you, sir.  And I see your hand is already raised.  Do you solemnly swear or affirm the testimony you're about to provide in this matter will be the truth, the whole truth, and nothing but the truth?

4

THE WITNESS: Yes, ma'am.

THE REPORTER: Thank you, sir. You can put your hand down and Counsel, you may proceed.

STEVEN CHIMERI,

Having been first duly sworn, was examined and testified under oath as follows:

DIRECT EXAMINATION

BY MS. PETROVA:

Q. Good afternoon. We are for deposition in Case Number 25CF2088, State versus Michael Bracknell. Detective Chimeri --

MR. JUSINO: You're breaking up.

THE WITNESS: Yeah. I can't hear her very well.

MR. JUSINO: I can't see her either. Now we can't hear anything.

THE REPORTER: This is the court reporter for the record. It appears Ms. Petrova has lost signal.

MS. PETROVA: I shouldn't have lost the signal. I don't know why.

MR. JUSINO: Is she signing out and signing back in?

THE REPORTER: I can't tell. It looks like she's turning her video on and off.

MS. PETROVA: That's --

5

MR. JUSINO:  It's not working.  Weird.  Did she touch the thing on the computer monitor to turn it off?

MS. PETROVA:  What do you mean -- what?

MR. JUSINO:  Did you close the -- the camera lens?  Because it's saying no camera.

MS. PETROVA:  No, I haven't touch it.

THE WITNESS:  Maybe try logging out and logging back in to the meeting?

MR. JUSINO:  There you are.  Now it's aimed your keyboard.

THE WITNESS:  Yeah.

MR. JUSINO:  Now it's aimed at your midsection.  Now it's aimed at your face.  There you go.  Good.

MS. PETROVA:  So what is --

MR. JUSINO:  You're good?

MS. PETROVA:  Yes, if I can see anything.

MR. JUSINO:  That -- that I can't tell you.

MS. PETROVA:  So you're saying that you see me?

MR. JUSINO:  We can -- and we can hear you well now, too.  Are you having a problem seeing us?

MS. PETROVA:  I -- I -- I can hear you, but there is nothing on the screen.  But if everything is

6

okay with you, I can continue with just audio --

MR. JUSINO:  Yeah, if you're willing to,
we're ready to go.  I think we can all hear you.

MS. PETROVA:  Okay.  Let's see.  What
is -- oh, my God, what's happening?

BY MS. PETROVA:

Q.    Okay.  Good afternoon, Detective Chimeri.

A.    Good afternoon.

Q.    You are employed where?

A.    The Zephyrhills Police Department and The
Federal Bureau Of Investigation.

Q.    And how long have you been with Zephyrhills
Police Department?

A.    Almost nine years, ma'am.

Q.    Okay.  We are here in case -- for Case Number
25CF2088.  You were involved in this case, right?

A.    Yes, ma'am.

Q.    And you wrote probable cause affidavit,
right?

A.    The what?

Q.    Probable cause affidavit.  Complaint
affidavit.

A.    Yes.  Yes.  I was just having a difficult
time understanding.  My apologies.

Q.    That's okay, I understand.  English is not my

native language so anything you don't understand, please let me know.  Did you have a chance to review it?

A.    Yes, ma'am.

Q.    Is it accurate?

A.    Yes, ma'am.

Q.    You also wrote the police report, right?

A.    Yes, ma'am.

Q.    Did you have a chance to review it?

A.    Yes, ma'am.

Q.    Is it complete?

A.    Yes, ma'am.

Q.    Accurate?

A.    Yes, ma'am.

Q.    Anything to delete?

A.    No, ma'am?

Q.    Anything to add?

A.    No, ma'am.

Q.    How did you get involved in the incident?

A.    I was involved in conducting a traffic stop.

MR. JUSINO:  Can we be more specific as to what incident?  Maybe the date of the incident?

MS. PETROVA:  Oh, sure.  I just announced the case number.

BY MS. PETROVA:

Q.    The incident that you were involved on May 15, 2025?

A.    Yes, ma'am.

Q.    With Mr. Bracknell?

A.    Yes.

Q.    Okay.  How did you get involved in this incident?

A.    I observed Mr. Bracknell commit multiple traffic infractions on an electric scooter.

Q.    So you were the -- the person who observed the -- observed him committing the infraction, not the other officers?

A.    I observed two of the violations, and then Detective Upchurch observed the other violations.

Q.    Okay.  You say in your report that you conducted a traffic stop?

A.    Yes, ma'am.

Q.    Looking at your body worn camera when you arrived, Mr. Bracknell was already stopped by Detective Upchurch -- up -- Uphill, right?

A.    Upchurch.  But no, ma'am.  If you could reference my dash camera, you'll see that myself and Detective Upchurch are conducting the stop simultaneous.

Q.    At the same time, that's what you're saying?

9

A.    Yes, ma'am.

Q.    Okay.  What -- what were you doing that day?
Did you follow the -- the defendant?

A.    I was conducting my -- I was conducting my
normal duties in the area of Gall Boulevard and Wawa.

Q.    Okay.  You also write in your report that
defendant has being known to actively flee law
enforcement.  What do you know about that?

A.    I knew Mr. Bracknell was out on bond for
fleeing to elude a police officer.  And earlier in my
career, I had to work a traffic crash investigation
where he sent a late '80's Mercedes Benz approximately
100 feet into the air over railroad tracks and crashed
into skate park fleeing from law enforcement.

Q.    This was earlier in your career?

A.    Yes, ma'am.  One of the cases was earlier in
my career.  The -- the most recent one, obviously, he
was currently out on bond for.

Q.    All right.  You don't know the facts of the
most recent one, right?

A.    No, ma'am.

Q.    How many traffic infractions he committed?

A.    I observed two.

Q.    And Detective Upchurch observed how many?

A.    I can't speak for what Detective Upchurch

10

observed.

Q.   Oh, okay.

A.   I just know that he stated that he ran the stop sign coming out of the Wawa.

Q.   Okay.

A.   And then I observed him fail to stop at the stop sign coming out of the Shell gas station at Gall Boulecard and County Road 54 on the northeast corner.

Q.   Okay.

A.   And then he proceeded northbound on Gall Boulevard and cut across Gall Boulevard onto what's called Main Street on the west side of Gall Boulevard and pursued the travel northbound.  And I observed him to fail to stop at the stop sign in front of the Napa Auto Parts on Main Street.

Q.   So both of you stopped Mr. Bracknell at the same time.  Did you start writing Mr. Bracknell any traffic citations?

A.   No, ma'am.

Q.   Why not?

A.   Because it's my discretion whether I want to issue a traffic citation or not.

Q.   Waiting for the K-9 officer to arrive?

A.   No, ma'am.  Waiting for my wants and warrant check to come back with a return to see if Mr.

11

Bracknell was wanted or not.

Q.   Prior to the actual stop, did you know --

A.   She -- she broke up.  I couldn't hear that.

MR. JUSINO:  Yeah, you broke up.

MS. PETROVA:  I did?

MR. JUSINO:  Yeah, now you didn't.  Go ahead.

BY MS. PETROVA:

Q.   Prior to -- prior to the actual stop, did you know that Mr. Bracknell is on the scooter?

A.   Before the traffic stop, yes.  I saw him.

Q.   You did?

A.   I observed him, yes, ma'am.

Q.   You recognized him?

A.   Yes, ma'am.

Q.   Okay.  That electric scooter didn't have a battery in it, right?

A.   It had a battery.  It was kind of -- I don't know what the official term for it being -- put together in an interesting manner, we'll call it.  It was kind of MacGyver'd.  I don't know if you know what that means but --

Q.   No.

A.   -- it was kind of uniquely assembled from parts.

Q.   Okay.  So at some point actually after the

12

stop, you advised Mr. Bracknell for the reason of the stop, right?

A.    Yes, ma'am.

Q.    And at this time -- at this time, you didn't observe Mr. Bracknell making -- he wasn't any threat to the officers at that time?

A.    No, ma'am.

Q.    He was calm, right?  Eating -- eating chicken nuggets, right?

A.    He was -- he was agitated, but I would say he wasn't forcefully combative in any way.  No, ma'am.

Q.    Okay.  And he was talking on the phone -- you let him talk on the phone with somebody?

A.    Yes, ma'am.

Q.    You didn't have personally reason to believe that he was armed at that time, right?

A.    I did not.  No, ma'am.

Q.    And he wasn't committing any criminal activity at that time aside from the traffic infractions, right?

A.    Correct, ma'am.

Q.    At -- the K-9 officer arrived, and it looks like he did sniff around the -- the scooter.  Did you observe that sniff?

A.    No, ma'am.

Q.    Shortly after the K-9 officer asked you to tell Bracknell that based on the sniff of the scooter, you have to search him, read him Miranda?

A.    Well, I always -- I always read people who were detained their Miranda rights pretty early in the investigation.

Q.    And for what he was detained?

A.    A positive alert to the odor of narcotics around the scooter.

Q.    Around the scooter.  And so he --  you read him Miranda?

A.    Yes, ma'am.

Q.    And he was patted down for weapon?

A.    Yes, ma'am.

Q.    You personally didn't see any weapon on him, right?

A.    No, ma'am.  But I was not the officer that was conducting the pat down.

Q.    That's okay.  I -- I'm just not saying anything.  And he was not threatening to you, right?

A.    No, ma'am.

Q.    And you didn't see Mr. Bracknell threatening anybody, right?

A.    Correct.

Q.    Tell me, please, how pat down is supposed to

be done?

A.   If -- if I'm not conducting the pat down --

Q.   If -- if you are doing -- not for this specific case.  If you are doing pat down, what you going to do, how you will do it?

A.   I'll normally do it in a quadrant method.  So I will start on someone's left or right.  There's no way that you have to do it, but I'll start at somebody's left front pocket, work my way down their left leg.  Then I'll normally work my way down their right pocket, their right leg, and then their abdominal area and appendix area, just in case they happen to be appendix carrying a firearm or any weapon for that matter.

Q.   Tell me please, you mentioned a pocket -- hand in pocket.  Do you put your hands inside the pockets?

A.   No, ma'am.

Q.   Just over the -- the pocket.  That's what you're saying, right?

A.   Yes, ma'am.

Q.   Tell me, please, do you know if any weapons were found on Mr. Bracknell?

A.   No, ma'am.  I do not believe so.

Q.   Do you know any knives?

15

A.    I don't believe so.

Q.    Box cutters, anything like that?

A.    No, ma'am.

Q.    Did you hear Mr. Bracknell making any
statements about weapons, knives, box cutters,
anything?

A.    I did not personally, no.

Q.    Tell me, please, did you observe the alleged
pat down done by Officer Limoges?

A.    I was positioned to the right side, so I
couldn't see what was taking place on the left side.
That would be a better question for Detective Upchurch.

Q.    Okay.

A.    The incident never got to my side that I was
observing because there was other circumstances that
took place before that.

Q.    Tell me for this other circumstances, please.

A.    I observed Mr. Bracknell tense up and then we
detained him.

Q.    And why you detained him?

A.    I heard Detective -- Officer -- K-9 Officer
Limoges say, what's that and then I observed Mr.
Bracknell attempt to widen his stance and tense up.  So
he was detained in handcuffs at that time.

Q.    You didn't see -- see any weapons, right?

16

A.    No, ma'am.  No.

Q.    No.  And just to clarify that, Mr. Bracknell was pat down by Officer --

A.    Limoges.  The K-9 handler.

Q.    Limoges.  Thank you, so much.  Thank you.  By Officer Limoges, based on the -- his K-9 alert around the scooter, am I --

A.    Yes, ma'am.

Q.    -- right?  Okay.  Do you know if the scooter was searched?  Anything there?

A.    Yeah, there was nothing observed on the scooter as far as contraband.

Q.    Who looked at the scooter?

A.    Myself and Detective Upchurch.

Q.    This is after alert or before?

A.    After the alert and then we will do a pat down for weapons if there is an alert for officer safety reasons.  And then we will conduct a search of the vehicle or scooter in this circumstance.

Q.    Let me see if I got the whole thing.  After an alert, you will do pat down for weapon and then -- and then search a vehicle?

A.    Yes, ma'am.

Q.    Do I got this?  Do you always do that down for a weapon?

17

A.    If the dog alerts to the odor of narcotics, yes, ma'am.

Q.    Is --

(Ms. Petrova is having connectivity issues)

MR. JUSINO:  No.  No.

MS. PETROVA:  Oh, okay.

MR. JUSINO:  There you go.

BY MS. PETROVA:

Q.    When -- when the sniff around the scooter was done, Mr. Bracknell was not in a position to see that, right?

A.    Correct.  I believe he requested it to be leaned up against a fence or something like that.  He placed it where he wanted it to because I guess the way the scooter was constructed, he didn't want to lay it down on its side because honestly, it looked like a fire hazard to me.  I don't know.  But the -- there was a reason why he didn't want it laying on it's side. And it didn't have a kickstand.  I verified that.

Q.    Didn't have what?  The stand?

A.    Yeah, the stand.

Q.    Okay.  Okay.  How fast he was going with the scooter?

A.    I wasn't pacing him for speed, so I could only speculate on that.

18

Q.   Approximately?  I'm just wondering.

A.   Approximately, 20 miles per hour.

Q.   20 miles per hour with this thing there?
Wow.  Okay.

A.   Yes, ma'am.

MS. PETROVA:  Okay.  I don't have any more
questions.  Victor?

MR. JUSINO:  Yeah.  I'm going to ask a
couple.

CROSS-EXAMINATION

BY MR. JUSINO:

Q.   Detective Chimeri, so after these traffic
infractions were observed, the defendant was stopped?

A.   Yes, sir.

Q.   Did you obtain his driver's license
information?

A.   I knew him through previous contact, so I
don't remember specifically if I verified it via his
Florida identification card or not, but I know I
conducted wants and warrant inquiry over the radio at
my vehicle.

Q.   Okay.  Because you knew him -- you knew him
from -- from previous interactions, correct?

A.   Yes, sir.

Q.   Okay.  And while you were doing the wants and

19

warrants search, is that when Limoges got there?

A.    Limoges was there simultaneous to the traffic stop being conducted.  I do believe that was the time that the K-9 sniff was conducted, yes.  But myself, Detective Upchurch, and Limoges all pulled down Sylvan Lane off of Daughtery Road at the exact same time.

Q.    Okay.  And once the stop was conducted, the defendant was asked to get off the scooter?

A.    Yes, sir.

Q.    And where was he standing in relation to the scooter when the sniff was conducted?

A.    So he was off to the side of it in front of my vehicle so that I could keep an -- an eye on him for obvious safety reasons or to make sure he wasn't going to take flight or anything like that.  Based upon where he requested to place the scooter, it was not within direct line of sight.

Q.    Okay.  So the dog wasn't running anywhere near the defendant?

A.    No, sir.

Q.    Okay.  However, the dog did alert, correct?

A.    Yes, sir.

Q.    And based upon that alert, prior to searching the scooter, that's when you guys searched the defendant for weapons for safety?

A.   That's when we'll do a pat down.  Yes, sir.

Q.   Okay.  And that's where you do the pat down -- okay.  And again, that was done prior to searching the scooter for officers safety, correct?

A.   Yes, sir.  Because if we were to search the scooter first, then obviously, there aren't any safety concerns with the individual.  So we conduct a search -- we do pat down of the person to make sure they're not armed.  And then this way if another officer's diverted attention to searching the scooter or the motor vehicle, whatever the circumstance may be, this way, there's no safety concerns.

Q.   And that's because he's not under arrest yet, right?  He does have access to anything in his pockets or anything at this point.

A.   Correct.  Yes, sir.

MR. JUSINO:  Okay.  All right.  I have no further questions.  Thank you.  Waive or --

MS. PETROVA:  I have one more.

REDIRECT EXAMINATION

BY MS. PETROVA:

Q.   Detective Chimeri, how -- did you request K-9 to be present immediately?

A.   No, ma'am.  He comes to all my traffic stops.

Q.   Oh, he already knows to come.

21

A.   Yes, ma'am.

Q.   Anytime you announce a traffic stop, he comes immediately?  That's what you're saying?

A.   Yes, ma'am.  He's my direct partner.

MS. PETROVA:  Okay.  No further questions.  Read or waive?

THE WITNESS:  Waive.

MR. JUSINO:  Thank you, sir.

MS. PETROVA:  Thank you for coming.  Have a nice day.  Stay safe.

THE WITNESS:  Thank you.

(Videoconference Deposition concluded at 3:25 p.m.)

22

REPORTER'S CERTIFICATE

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH


I, Brittany Bridges, do hereby certify that the

deposition of STEVEN CHIMERI was produced into a

verbatim transcript in accordance with all state rules

and laws for the State of Florida.  I further certify

the testimony contained in this transcript was produced

from an audio recording and is a true and accurate

transcript to the best of my ability.




_____

BRITTANY BRIDGES, CER

Notary Public - State of Florida

My Commission No. HH230969

Expires:  02/20/2026

23

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, the undersigned authority, certify that STEVEN CHIMERI, appeared before me via videoconference and was duly sworn.  WITNESS my hand and official seal this 29th day of September, 2025.

*Brittany Bridges*

_____

BRITTANY BRIDGES, CER

Notary Public - State of Florida

My Commission No. HH230969

Expires:  02/20/2026