# Exhibit C

*Deposition of Officer Limoges,*
*September 29, 2025*

1

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA


STATE OF FLORIDA,                    )
            Plaintiff,               )
                                     )
                                     )
    vs.                              ) Case No. 2025-CF-2088
                                     )
                                     )
MICHAEL PHILIP BRACKNELL,            )
            Defendant.               )
_____         )


DEPOSITION OF EMILE LIMOGES


        DATE TAKEN:        September 29, 2025


        TIME:              3:26 p.m. to 3:52 p.m.


        PLACE TAKEN:       Videoconference (Zoom)


        BEHALF OF:         The Defendant


        REPORTED BY:       Brittany Bridges, CER
                           Contract Court Reporter
                           Twentieth Judicial Circuit
                           Florida, and Notary Public.



_____

                MIKULICE REPORTING SERVICES
                Courtney Building, Suite 201
                   2069 First Street,
                Fort Myers, Florida 33901
                  OFFICE (239)334-6545

ORIGINAL

2

A P P E A R A N C E S

For the Plaintiff:

       Victor Jusino, Assistant State Attorney
       Office of the State Attorney
       38053 Live Oak Avenue
       Dade City, Florida 33523

For the Defendant:

       Pavlina Petrova, Esquire
       Regional Conflict Counsel
       13815 US 98 Bypass
       Dade City, Florida 33525

_____

I N D E X

|                                          | PAGE |
|------------------------------------------|------|
| Direct Examination by Ms. Petrova        | 4    |
| Cross-examination by Mr. Jusino          | 18   |
| Redirect Examination by Ms. Petrova      | 21   |

(Videoconference Deposition commenced at 3:26 p.m.)

THE REPORTER:  We are currently on the record.  Today is Monday, September 29, 2025.  It's currently 3:26 p.m.  My name is Brittany Bridges.  I'm the court reporter and Florida notary.  We're here for the deposition of Officer Emile Limoges.  Prior to going on the record, Mr. Limoges presented his Florida driver's license, and I was able to confirm his identity that way.  At this time, we'll take appearances for the record beginning with the State.

MR. JUSINO:  Victor Jusino on behalf of the State.

MS. PETROVA:  Pavlina Petrova, Office of the Regional Counsel for Michael Bracknell.

THE REPORTER:  And then Mr. Limoges, will you say and spell your first and last name for the record?

THE WITNESS:  Emile Limoges, E-M-I-L-E L-I-M-O-G-E-S.

THE REPORTER:  Thank you, sir.  And will you raise your right hand?  Do you solemnly swear or affirm the testimony you're about to provide in this matter will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE REPORTER:  Thank you, sir.  And Counsel,

4

you may proceed.

                    EMILE LIMOGES,

     Having been first duly sworn, was examined and

               testified under oath as follows:

                    DIRECT EXAMINATION

BY MS. PETROVA:

     Q.   Good afternoon, Officer Limoges.  As you can
see, you only can hear me.  Something happened with my
technology on my side.  So I hope you don't have
objection to that and we can proceed to the depo?

     A.   Okay.  I can under -- I can understand you
sometimes.  And sometimes it sounds like you're in a
bathroom.

     Q.   Well, I try --

     A.   It's okay.  I'll try to do my best.

     Q.   You're employed -- you were employed where?

     A.   Zephyrhills Police Department.

     Q.   About how long?

     A.   I've been there for almost 11 years.

     Q.   In what capacity?

     A.   As a -- I was a patrol officer, and then now
I'm a K-9 officer.

     Q.   How long do you have been K-9 officer?

     A.   For 10 years.

     Q.   You --

5

(Ms. Petrova's audio is breaking up)

MR. JUSINO:  Again, you gotta look this way.
Go ahead.

MS. PETROVA:  Officer -- 2025 -- right --

THE WITNESS:  All I got was 2025 and right.

MS. PETROVA:  May 15th.

THE WITNESS:  May 15, 2025?

MS. PETROVA:  Yes.

THE WITNESS:  I was with -- yes, I was a K-9
officer then.

BY MS. PETROVA:

Q.  Okay.  And what are your duties now?

A.  I'm still a K-9 officer.

Q.  Okay.  You wrote a report in this case,
right?

A.  Yes, ma'am.

Q.  Did you have a chance to review it?

A.  Yes, ma'am.

Q.  Is it complete?

A.  Yes, ma'am.

Q.  Accurate?

A.  Yes, ma'am.

Q.  Anything to delete?

A.  Nothing that I -- can -- I -- can -- I recall
that -- that I need to delete, no.

6

Q.   Anything to add?

A.   I don't know what you mean.  Like, what do you mean?  Do I need to add more to it?

Q.   Yes.

A.   It has -- it has my -- my -- my body cameras also attached to it.  I -- I don't -- there's nothing I need to add to it, no.

Q.   Okay.  And your K-9 is Woody, right?

A.   Correct.

Q.   Is Woody still active?

A.   Yes, ma'am.

Q.   How long have you been with K-9 Woody?

A.   He was -- I've been with him since he was eight weeks old.

Q.   Wow.

A.   Yes, ma'am.

Q.   So you had the training with him, right?

A.   Yes, ma'am.

Q.   Who -- what is the name of the trainer who trained him?

A.   Who trained him?  Deanna.  She's from Pasco County Sheriff's Department.

Q.   Deanna?

A.   Yes, ma'am.

Q.   What is her last name?

A.   I don't have her last name with me. It's -- it's -- that's what she goes by.  It's Pasco County Sheriff's Department has several trainers, and she was just the head trainer.  I can get it to you if you need me -- need her last name.

Q.   All right.  What --

MR. JUSINO:  No.

MS. PETROVA:  -- or -- or drugs?

MR. JUSINO:  You've got to repeat the question.

BY MS. PETROVA:

Q.   What kind of training K-9 Woody has?  For narcotics?

A.   Yes, he's a narcotic trained dog.

Q.   How about patrol?

A.   No, ma'am.

Q.   Okay.  What kind of narcotics?

A.   Marijuana, Cocaine, Heroin, and Meth.

Q.   How --

A.   I didn't hear what you said.

Q.   How long was his training?

A.   His training was from the time he was eight weeks old until for -- it was approximately about 10 months.

Q.   Oh.  Your department keep the training logs,

8

right?

A.    Yes, ma'am.

Q.    Who keep that?

A.    Records. (Mr. Limoges phone rings) Sorry.

Q.    That's fine.  During the training, tell me please what are the alerts -- how he will start alerting that he feel the odor of Marijuana?  What actions he takes during the training?

A.    You want to know what his alert is?

Q.    During the training, yes.

A.    During training, his alert is -- is bracketing the odor, change of demeanor, and he -- and he -- he freezes once he -- he gets to source.  Hold on my -- my heat alarms going off in my car because I had to turn it off so I can understand what y'all were doing.  Give me just a second.

Q.    Um-hum.

A.    Okay.

Q.    So -- so you said the final response is he -- he stopped and stare at the source?  Did I got this right?

A.    If he gets close to source, that's what he'll do.  He'll stop and stare at the source.

Q.    How about anything in the head, any -- what kind of actions?  You said change in behavior.  What do

you mean by that?

A.   Okay.  He'll slow down.  He'll -- he'll go from an area where he's at to another area.  He's bracketing the odor.  He'll go in and out of the scent cone, head snap, that kind of thing.

Q.   Was he consistent with the alerts during the training?

A.   He started training at 8 weeks old.  So I would say probably in the beginning, he was -- he was -- he -- when he first started, he was -- he was a little more of a puppy.  But yes, eventually, he became consistent to doing what he was doing.

Q.   And tell me, please --

A.   I lost you.

Q.   I'm assuming he has certifications?

A.   He does have certifications.  He's certified with NNDA.

Q.   What is that certification?

A.   National Narcotic Detector Association.

Q.   Okay.  How did you get involved in the incident?

A.   I went to a traffic stop for Officer Upchurch who's on my -- he's -- he's one of my partners.

Q.   How many partners do you have?

A.   Two.

10

Q.   Do you always go to their traffic stops?

A.   Yes, ma'am.

Q.   You just go there automatically?  You don't have to -- they don't have to ask you for you to go there?

A.   No, ma'am.

Q.   Okay.

A.   We're a crime unit.  So we -- the three of us work together every night -- or every day.

Q.   Okay.  Tell me, please, what did you do when you arrived at the scene?  What did you observe?

A.   What did I observe?

Q.   Yes.

A.   I observed them conducting a traffic stop on Mr. Bracknell who was on an electric scooter.

Q.   Okay.  And did you speak with him at that time?

A.   I did not speak with Mr. Bracknell at that time.

Q.   Okay.  What happened after that?

A.   Mr. Bracknell decided he wanted to put his electric scooter off to the side.  I conducted an open air sniff of the electric scooter, K-9 Woody alerted to the electric scooter.  I -- I placed K-9 Woody back up. Went to --

11

Q.   Okay.  Let me stop you for a second.

A.   All right.

Q.   So you said that you conducted to a sniff around the scooter?

A.   Yes, ma'am.

Q.   Tell me, please, more specifically, what action Woody take to show you the alert?

A.   K-9 Woody worked his way -- way from the front to the back of the scooter.  He -- he alerted to the center of the scooter.  He went from the -- from the driver's side of the scooter across to the middle of the scooter, put his nose on the -- on the inside and -- and -- and locked up on the back of the scooter. Backed up, then went back to the -- to it again, and I gave him his praise.  That was his alert.

Q.   What kind of praise you give for the alert?

A.   I change it regularly, but that day he got a toy.  A tug toy.

Q.   When you say you change it regularly, what does it mean regularly?

A.   Regularly -- at a different days, sometimes I give him the to -- at that -- at -- at the actual location.  Sometimes we give him the toy whenever we get back to the vehicle.  I -- he -- he normally gets a yes whenever -- whenever he does find something, but

12

that's about it.  I try to change it up so he -- he's not just wanting something like that.  So it gives him something different.

Q.   So -- but let's say you gave him the toy, you say, where do you keep this toy during the sniff?

A.   Underneath my vest usually.

Q.   Okay.  So -- and correct me for I'm getting this wrong.  So Woody doesn't actually know that you have the toy with you.  That's what you're saying?

A.   He doesn't know if I have the toy with me?  I don't know.

Q.   Yeah.

A.   I don't whether he knows or not.  I mean, he's a dog.  His nose is, like, 700 times better than a human.  So I'm pretty sure he could smell just about anything in any area.

Q.   Okay.  At that -- at that time, you actually -- Mr. Bracknell was not a threat to you, right, at that time?

A.   No, ma'am.  Not to me.

Q.   Right.  And you didn't see him threatening any other officers, right?

A.   I did not.

Q.   And you didn't observe any criminal activity, right?

A.    Well...

Q.    At that time?

A.    Not at that time.  No, ma'am.

Q.    No.  And there was no reason to believe that he is armed?  At that time, I'm talking about.

A.    No, ma'am.

Q.    Okay.  He wasn't hostile, right?

A.    I don't know.  What do you mean by hostile? I wasn't talking with him whenever I was doing the sniff.  So I -- I wasn't talking to him at all.  I -- I didn't have any conversation with him at all.  So I don't know what he was doing.  He was with Officer Chimeri and Officer Upchurch.

Q.    Okay.  After K-9 Woody alerted, you went to Detective Chimeri, right?

A.    Yes.  I went to Detective Chimeri and advised him of the alert.

Q.    All right.  And you asked Detective Chimeri to tell Mr. Bracknell that because of the alert around the scooter, he will be -- he needs to be read Miranda rights?

A.    I told him -- I told him he needed to read his Miranda rights from that point because it became a narcotics investigation.

Q.    Oh, okay.

A.    And he was detained.

Q.    He was detained?

A.    Correct.

Q.    And you started searching him?

A.    No.  Officer Chimeri read him his rights.  I was -- I went -- went up to pat him down for weapons, he advised he had a knife in his pocket.  And then I started -- I started searching him, looking for the knife.

Q.    Okay.  You said that -- you stated this in your report, that he advised that he has a knife in the pocket.  Your body worn camera was on, right?

A.    Yes, ma'am.

Q.    So Mr. Bracknell statement that he has knife in his pocket would be on your body camera recording, right?

A.    Yes, ma'am.  Probably better on Officer Upchurch's or Officer Chimeri because we were all three right there.

Q.    On all three officers?

A.    Yes, ma'am.

Q.    And did you find any knife on defendant?

A.    I did not locate a knife, no.

Q.    Did you find any weapons?

A.    I did not.  I don't think I located any

15

weapons.

Q.   Did you go --

A.   Not that I recall.

Q.   Did you go in Mr. Bracknell's pockets?

A.   I went into his left pocket where he told me he had -- he said he had a knife.  He gestured to his left side.  I -- I patted the outside of it.  I couldn't tell what was inside of it.  So I went in to get -- to see if I could get the knife from his left -- left cargo pocket.

Q.   And --

MR. JUSINO:  Breaking up.

MS. PETROVA:  Once --

THE WITNESS:  What's that?

MS. PETROVA:  Is -- so did you continue -- can.

THE WITNESS:  I -- I -- I couldn't understand the beginning of your question.  I'm sorry.

MS. PETROVA:  Right.

BY MS. PETROVA:

Q.   Once you saw that there is no knife in his pocket, did you continue searching him?

A.   Once I found out there was no knife in his pockets?

Q.   Yes.

16

A.   Did I continue searching?  No.

Q.   Yeah.

A.   I -- no, I don't.  I -- after I checked all his pockets, I did not continue searching.

Q.   Four --

A.   I can't hear you.

Q.   I -- I --

(Ms. Petrova is having connectivity issues)

MR. JUSINO:  Can't hear you.  Wait a second.  Go ahead.

MS. PETROVA:  I don't know.

MR. JUSINO:  Right there.  Go ahead.

BY MS. PETROVA:

Q.   Did you feel anything in his pocket to amount to a weapon?

A.   I did not feel anything in his pockets that amounted to a weapon at that time, no.  I only had his word.

(Mr. Jusino's phone is ringing)

MR. JUSINO:  I'm in depo -- I'm in depo's.

THE WITNESS:  Did y'all -- did they freeze?  Oh.

BY MS. PETROVA:

Q.   Prior to start -- start searching him, you didn't observe -- you didn't have any reason to believe

that he's armed, right?

A.    Prior to searching him --

Q.    Yes.

A.    I -- I -- he -- he had the -- obviously, the dog alerted.  And narcotics -- normally with narcotics comes -- comes to weapons.  So I -- he's -- I don't know whether he had anything or not.

Q.    But that's the -- your only reasoning.  The guess, when there are narcotics, there are weapons.  That's what you mean?

A.    It's not a guess.  I -- I -- it usually -- with it -- with it -- it's my training and experience.  That's usually the way it is.  But I'm not saying it's a guess.  We -- we check everyone that we're going to be standing next to.  I -- I try to check everyone we're going to be standing next to, yes.

Q.    Prior to the search, you didn't personally observe any bulges on him to give you -- to give you indication that he's committing any crime, right?

A.    Prior to the search --

Q.    Right.

A.    You know, I don't -- what do you mean?  Committing any crime, as in like, he had baggy shorts or -- or what do you mean?

Q.    Prior to the search, did you observe

anything -- any bulges on Mr. Bracknell?

A.   Mr. Bracknell was wearing khaki shorts that had -- the pocket actually was puffed out quite a bit on the -- on the left side, the cargo pocket.  I -- I think it was due to the fact that it was full of bags. But -- and I did see his shirt was hung down over the top of the -- of his shorts, so I couldn't see underneath his shirt.

MS. PETROVA:  Okay.  I don't have any more questions.

MR. JUSINO:  You don't have any more questions?

MS. PETROVA:  No.

MR. JUSINO:  All right.  I do.

CROSS-EXAMINATION

BY MR. JUSINO:

Q.   All right.  So Officer Limoges -- or Limoges, you arrived -- you arrived on the scene, and you said that the -- a sniff was conducted and that Woody alerted to the center of the bike, correct?

A.   Yeah, the electric scooter.  Yes, sir.

Q.   Of the electric scooter.  Now, what is significant about that?

A.   It means that the -- the -- this -- the electric scooter that he was on or the vehicle that he

was in, is -- had -- had narcotics on it at one point or still had narcotics on it.  There was narcotics in the air.

Q.   Okay.  And so does -- the smell of those narcotics is transient, correct?  It'll move?

A.   Correct.

Q.   Okay.  And in that situation where someone was seated on that scooter just prior to a sniff being conducted, at that point, you have probable cause to believe that the operator may be in possession of narcotics?

A.   Correct.  The -- the odor of narcotics can be transferred from their hands on the -- on to the things.  It can also be transferred through them carrying something, anything like that.

Q.   Okay.  So -- I'm sorry.  Go ahead.

A.   I -- I would -- I would -- that's normally if -- if we get an alert, that's -- that's what you -- what you think is that somebody -- somebody that was on that scooter recently was using narcotics or had narcotics on them.

Q.   When during the process, were -- was that large amount of Methamphetamine found?

A.   While I was searching for the -- the knife in his pocket, I felt like a non anatomical bulge, large

20

bulge on his left side of his leg.  And whenever I touched it, he jerked away.  And -- and I asked him what it was.  He jerked away and -- and -- and we had to detain him.  And while we -- while we were detaining him, I had to -- I loosened up his belt, and I could feel -- I -- I pulled over -- open out the -- so the thing that I felt, which was a sock, and handed it over to Officer Chimeri.  That's what -- where the narcotics were in.

Q.   Okay.  So that was during your weapons pat down, when you found that non anatomical bulge, you asked him what it was?

A.   Correct.

Q.   And he was pulling away so you had to detain him at that point?  Okay.

A.   Correct.

Q.   Who -- did anybody -- did anyone field test what -- what was in that sock?

A.   I believe Officer Chimeri did.  I wasn't there for that, but I believe Officer Chimeri or Officer Upchurch.  One of the two.

Q.   Okay.  So you -- you didn't do it, is basically my question.

A.   Correct.

MR. JUSINO:  I have no further questions.

21

Appreciate it.

MS. PETROVA:  I have one more.

THE WITNESS:  Yes, ma'am.

REDIRECT EXAMINATION

BY MS. PETROVA:

Q.   Officer Limoges, can you tell us how long the odor of narcotics would stay in a vehicle or in this situation, on the scooter?

A.   That'd be --

Q.   Do you know?

A.   That would be something you'd have to ask a scientist.  It depends on the strength of the narcotics.  It depends on the -- the environment.  Did it get rained on, did it get wet, did it -- whatever it would -- it would depend -- depend on a lot of different things; how long it would stay.

Q.   So you cannot tell us, right?

A.   No, I can't tell you how long it would stay.

Q.   Okay.

MR. JUSINO:  Did she freeze?

MS. PETROVA:  Do you hear me now?

THE WITNESS:  Yes, ma'am.

MS. PETROVA:  Okay.  I don't have further questions.  Thank you for coming.

THE WITNESS:  Thank you, my dear.

22

MS. PETROVA:  Read or waive?

THE WITNESS:  I'll-- I'll wait 'til the day of.

MS. PETROVA:  Okay.  Waive, madam -- madam court reporter.  Thank you for coming.  Have a nice day and stay safe.

THE WITNESS:  Yes, ma'am.  You, too.

(Videoconference Deposition concluded at 3:52 p.m.)

23

REPORTER'S CERTIFICATE

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Brittany Bridges, do hereby certify that the
deposition of EMILE LIMOGES was produced into a verbatim
transcript in accordance with all state rules and laws
for the State of Florida.  I further certify the
testimony contained in this transcript was produced from
an audio recording and is a true and accurate transcript
to the best of my ability.

_____

BRITTANY BRIDGES, CER

Notary Public - State of Florida

My Commission No. HH230969

Expires:  02/20/2026

24

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, the undersigned authority, certify that EMILE LIMOGES, appeared before me via videoconference and was duly sworn.  WITNESS my hand and official seal this 29th day of September, 2025.

_____

BRITTANY BRIDGES, CER

Notary Public - State of Florida

My Commission No. HH230969

Expires:  02/20/2026