UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 8:26-cr-139-KKM-AEP

MICHEAL PHILLIP BRACKNELL

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by Gregory W. Kehoe, United States Attorney for the Middle District of Florida, opposes Michael Phillip Bracknell's motion to suppress (Doc. 25). The evidence the defendant seeks to suppress was obtained through lawful law enforcement actions.

## STATEMENT OF FACTS

Phillip Michael Bracknell was stopped by the Zephyrhills Police Department (ZPD) on May 15, 2025, after he violated traffic laws while operating an electric scooter. The officers that conducted the traffic stop, Detectives Steven Chimeri and Morgan Upchurch, each observed Bracknell fail to stop the scooter he was driving at stop signs. Aware that Bracknell had a history of possessing narcotics and fleeing or attempting to flee from law enforcement, they determined that they would attempt to conduct the traffic stop at a location that reduced Bracknell's ability to flee. They commenced the

traffic stop on Sylvan Lane, a dead-end dirt road that connects to Daughtery Road, in Zephyrhills, Florida. As Chimeri began a traffic investigation, Officer Emile Loges had his K-9 partner conduct an open-air sniff of the scooter. When the K-9 alerted, indicating the odor of narcotics was present, the traffic investigation that had just commenced transformed into a narcotics investigation. Chimeri informed Bracknell of his rights, and Limoges began conducting a protective search of Bracknell. Before frisking Bracknell, he asked him if he had anything that would poke him or hurt him (i.e., a weapon). Bracknell indicated he had a pocketknife and gestured to his left front pocket. Limoges conducted a protective search based on his reasonable belief that Bracknell had a weapon in his pants. During the protective search, he removed items from Bracknell's pants as needed to locate the pocketknife or other weapon. He touched a "non-anatomical bulge" in Bracknell's pants, and Bracknell pulled away from him. Bracknell was then handcuffed to facilitate the completion of the protective search. Limoges touched the non-anatomical bulge again and readily ascertained that it contained methamphetamine crystals. He then retrieved the item—a sock containing packages of methamphetamine—from under Bracknell's pants. (Subsequent laboratory analysis confirmed that the substance contains approximately 94 grams of pure methamphetamine with a total weight of about 98 grams.)

Body camera and dash camera video recordings documented the events described below.[1] The recordings begin after the detectives observed the traffic violations and before the traffic stop commenced.

After seeing Bracknell turn left (to the north) from Sylvan Lane, Upchurch turned onto the dirt road and activated his lights and siren at 15:41:57, commencing the traffic stop. Bracknell stopped his scooter and stepped off it at approximately 15:42:04. Upchurch's police vehicle came to a stop at 15:42:06; he exited his vehicle at 15:42:08 and approached Bracknell. Chimeri arrived and stopped his police vehicle near Upchurch's vehicle at 15:42:08 as Upchurch was exiting his vehicle.

As Upchurch began walking toward Bracknell, the defendant was standing on the ground and holding his scooter upright. At 15:42:12, Upchurch told Bracknell, "You ran a whole bunch of stoop signs! We were trying to stop you." Bracknell asked, "Where at?" Upchurch told him he ran stop signs coming out of the Wawa at FL-54 and U.S.-301, and all the stop signs on the road in front of Quality Inn and in front of Goden Corral. As Upchurch spoke with Bracknell, Chimeri exited his vehicle, called in the stop and approached them. At 15:42:40, Bracknell told Chimeri, "I ain't done a damn thing wrong." Chimeri told Bracknell that he did not stop at a stop sign

[1] Time from the videos is provided by 24-hour clock (hour: minute: second).

and explained that he had to follow the traffic laws when operating a scooter. After they discussed what to do with Bracknell's scooter, Bracknell leaned it against a utility pole support line at 15:44:20.

Officer Limoges, who was part of the team patrolling the area with Chimeri and Upchurch, arrived at the scene no later than 15:42:25 with his K-9 partner, Woody.[2] Immediately after Bracknell placed his scooter against the utility pole support line, Limoges and Woody began the process of conducting an open-air sniff of the scooter.[3] Limoges collared and prepared Woody to exit the vehicle, and by 15:44:58, Woody was out of the vehicle and on the ground. Limoges walked Woody to Bracknell's scooter, and Woody began an open-air sniff by sniffing the ground around the scooter at approximately 15:45:14. At approximately 15:45:23, Woody alerted to the center area of the scooter with a change of demeanor and bracketing, and gave a final response by staring at the center of the scooter. The alert indicated the odor of narcotics was present in that location. After Woody completed the alert, Limoges began walking Woody back to his K-9 police vehicle, and by 15:46:11, Woody was back in the K-9 vehicle with the doors closed.

---

[2] K-9 Woody can be heard barking on Chimeri's dash cam video recording.

[3] K-9 Woody is certified by the National Narcotic Detector Dog Association in the detection of narcotics, including methamphetamine.

Meanwhile, after Bracknell leaned his scooter against the utility pole support (15:44:20) and as Limoges and K-9 Woody began the process of the open-air sniff, Bracknell and Chimeri walked towards Chimeri's police vehicle. At 15:44:35, Chimeri instructed Bracknell to stand in front of Chimeri's vehicle, and approximately two seconds later, Chimeri opened the door to his vehicle and entered it. Chimeri then began a wants and warrants check, which is a routine component of a traffic stop, while Bracknell stood in front of the vehicle, ate something, pulled out his cellphone, placed a call, and began talking on the phone.

Upon entering his police vehicle, Chimeri began using the computer and radio to obtain information pertinent to the traffic stop. He used the vehicle's radio to request information on Bracknell at 15:45:21 (seven seconds after K-9 Woody began sniffing the area around the scooter, and two seconds before Woody alerted at the center of the scooter). After he secured Woody in the K-9 vehicle, Limoges walked to Chimeri's vehicle and stood outside the passenger side door. At 15:46:27, Chimeri and Limoges began discussing how they would proceed with a narcotics investigation. At 15:46:46, Chimeri stepped out of his vehicle and Bracknell engaged him in further conversation regarding the traffic violations. At 15:47:29, Chimeri began explaining to Bracknell that the traffic investigation had become a narcotics investigation.

At 15:47:47, he informed Bracknell that he was detained, but he was not under arrest, and he asked Bracknell if he understood. Bracknell replied, "Yes, sir," and after Detective Chimeri read *Miranda* warnings to Bracknell, the defendant acknowledged he understood those rights.

Officer Limoges stood by until Chimeri finished reading *Miranda* warnings to Bracknell. After verifying that Bracknell understood his rights, Chimeri, at 15:48:08, instructed Bracknell to put his hands on the police vehicle. At 15:48:10, Limoges asked Bracknell if he had anything on him that would poke him or hurt him. Bracknell indicated he had a pocketknife and, at 15:48:12, patted his left hand on his left front pants pocket.

At 15:48:14, Limoges began to frisk Bracknell to find the pocketknife and to determine if he had any other weapons. He began by patting the outside of Bracknell's clothing and instructing him to spread his feet. After patting the outside of the pockets on the left side of Bracknell's cargo shorts and feeling objects in them, Limoges put his fingers in the upper left pocket to try to find the pocketknife. He detected items in the pockets, including items that could block his ability to feel a pocketknife or other weapon, and he pulled items out of the pockets to enable him to continue the protective search for the pocketknife or other weapon. He pulled a wallet from the left front pocket and placed it on the police vehicle. He then pulled out a film cannister,

and Bracknell spontaneously stated, "Viagra."[4] Limoges put his hand in the pocket again and pulled out a large Zip-lock bag. At 15:49:00, he asked Bracknell why he was shaking, and Bracknell responded that it was because he was being harassed. Limoges continued with the protective search, and from Bracknell's left rear pocket he pulled out a wallet attached to a chain. The chain was also attached to the front of Bracknell's pants. Limoges unhooked the chain from the pants and placed the second wallet on the hood of the police vehicle with the other items. He pulled another item out of the upper front left pocket and put it on the vehicle. At approximately 15:49:28, he placed his hand in and over the same pocket and felt a non-anatomical bulge under the clothing. At 15:49:33, he asked Bracknell, "What is that?" and Bracknell pulled away, causing the officers to place him in handcuffs to enable the protective search to continue.

At 15:49:48, Limoges said there was something inside the left side of his pocket and placed his hand on the outside of Bracknell's pants over the non-anatomical bulge. Bracknell continued to lean away from Limoges, prompting the officer to tell him to stop. Limoges put his hand in the pocket and told Bracknell, "That's the whole reason you jerked away from me." Having determined by touch that the non-anatomical bulge contained what felt like

[4] Possession of Viagra (sildenafil) without a prescription is a second-degree misdemeanor under Florida Statutes § 499.03.

methamphetamine crystals, Limoges began to try to retrieve the contraband. He placed his hand in an upper pocket of the cargo shorts and, at 15:49:54, told Bracknell to stop and said, "That's the whole reason you jerked from me whenever I put my hand right here; don't even start, I felt it." Limoges then loosened Bracknell's belt, and while doing so told Bracknell he had something right under his shorts. At 15:50:22, Limoges asked, "Do you have something tied right here?" and said, "There's something, right under his shorts." At 15:50:29, Limoges reached under the shorts, pulled a sock out that was hidden inside Bracknell's underwear, and placed it on the police vehicle. At 15:50:41, Limoges indicated where he had felt the non-anatomical bulge and resumed the protective search. Bracknell said something, to which Limoges responded at 15:50:46, "I didn't feel that? Is that what you're going to tell me now?"

Officer Limoges felt the left side of Bracknell's pants again, and then he continued to frisk Bracknell, with Upchurch assisting. Limoges completed the protective search without finding a pocketknife or other weapon.

At approximately 15:50:33, Detective Chimeri felt the sock and detected the presence of crystals consistent with methamphetamine. At 15:50:33, he pulled two plastic bags out of the sock, and at 15:50:49 he said, "That is definitely a non-anatomical bulge." At approximately 15:51:18, he

began performing a chemical field test of the substance in the plastic bags found in the sock. The test was positive for methamphetamine.

## LEGAL MEMORANDUM AND ARGUMENT

The officers seized the methamphetamine without a warrant, based on probable cause, after the non-anatomical bulge in Bracknell's pants was readily determined by plain feel to contain contraband. The traffic stop, protective search, and seizure were all lawful.

### I. The Traffic Stop Was Lawful Under *Terry v. Ohio*

The Fourth Amendment permits a seizure for a police investigation of a traffic violation. *Rodriguez, v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 1614 (2015). A traffic stop is a seizure for Fourth Amendment purposes. *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008). An investigative stop is permissible when supported by reasonable suspicion that a crime is taking place. *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008). Reasonable suspicion must be determined in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968), which requires that officers "have a reasonable, articulable suspicion based on objective facts." *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000). A "reasonable suspicion" is more than just a hunch; it requires some minimal level of objective justification for the investigatory stop, but less than probable cause. *United States v. Soklow*, 490 U.S. 1, 6, 109

S.Ct. 1581, 1585 (1989). Reasonable suspicion is based on the totality of the circumstances, accounting for an officer's experience. *Harris*, 526 F.3d at 1337–38.

In this case, two detectives saw Bracknell operating a vehicle—an electric scooter—and failing to stop at an intersection and stop signs, in violation of Florida Statutes § 316.123.[5] Their observations provided reasonable suspicion for an investigatory stop.

## II. The K-9 Sniff of Bracknell's Scooter Was Lawful

Government conduct that reveals the presence of contraband—such as a "canine sniff" by a trained narcotics detection dog—and that does not compromise any legitimate privacy interest, is not a search under the Fourth Amendment. *U.S. v. Jacobsen*, 466 U.S. 109, 123-124, 104 S.Ct. 1652, 1662 (1984). But a seizure justified only by a traffic stop becomes unlawful if the stop is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation and attending to related safety concerns.

---

[5] Florida Statutes § 316.123 provides that, except when directed to proceed by a police officer or traffic control signal, every driver of a vehicle approaching an intersection indicated by a stop sign shall stop at a clearly marked stop line, but if none, before entering the crosswalk on the near side of the intersection or, if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. A "vehicle" is "[e]very device in, upon, or by which any person or property is or may be transported or drawn upon a street or highway, except personal delivery devices, mobile carriers, and devices used exclusively upon stationary rails or tracks. Florida Statutes § 316.003(109).

*Rodriguez, v. United States*, 135 S.Ct. 1609, 1611 (2015); *Illinois v. Caballes,* 543 U.S. 405, 407, 125 S.Ct. 834, 837 (2005).

Here, officers did not delay or extend the stop. Officer Limoges and his partner K-9 Woody were on scene at the beginning stages of the traffic stop, and they completed the drug sniff within seconds of Detective Chimeri getting in his police vehicle and requesting information about Bracknell.

## III. Law Enforcement Had Probable Cause For a Narcotics Investigation

An alert from a trained drug-detection dog may provide probable cause for a search, without anything more. *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006). And a dog alert may be considered with other factors to establish probable cause. *Harris*, 568 U.S. at 244–45. In this case, in addition to the alert from K-9 Woody, the officers knew that Bracknell had possessed methamphetamine while operating a vehicle on previous occasions.

## IV. The Officers Were Justified in Conducting a Protective Search

It is judicially recognized that individuals involved in narcotics trafficking are often armed, and weapons are "tools of the trade.". *U.S. v. Martin*, 794 F.2d 1531, 1533 (11th Cir. 1986); *U.S. v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989). "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a

patdown search "to determine whether the person is in fact carrying a weapon." *Terry*, 392 U.S. at 24. When determining whether law enforcement made a reasonable assessment, great deference is given to the judgment of trained law enforcement officers. *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003). Such deference applies when an officer makes a reasonable mistake of fact. *Id*. Agents of the government must not always be correct, but they must be reasonable. *Illinois v. Rodriguez*, 497 U.S. 177, 185, 110 S.Ct. 2793 (1990).

To justify a protective search of a person, the officer's belief must be based on a reasonable suspicion that the individual is armed and dangerous under the totality of the circumstances, and law enforcement officers may rely on common sense conclusions. *United States v. Bishop*, 940 F.3d 1242, 1250 (11th Cir. 2019). Definitive evidence or an absolute certainty that the individual is armed is not required. *Id*. The purpose of the limited search is not to discover evidence, but to help provide officer safety, and must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others. *Terry*, 392 U.S. at 26; *Adams v. Williams*, 407 U.S. 143, 145-146, 92 S.Ct. 1921, 1922-1923 (1972). A protective search that goes beyond what is necessary to determine if the suspect is armed is no

longer valid under *Terry*. *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 2136 (1993).

Here, Officer Limoges was warranted in believing his safety and the safety of his fellow officers was in danger. He had probable cause to believe that Bracknell possessed narcotics. He knew that individuals involved in narcotics trafficking often possess weapons. And Bracknell told him he had a pocketknife in his pants before Limoges began the patdown search.

## V. Officer Limoges Was Justified to Search Beyond the Outer Clothing by Searching Bracknell's Pockets for a Weapon

The Fourth Amendment protects people, not places. *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511 (1967). Wherever an individual has a reasonable expectation of privacy, he is entitled to be free from unreasonable governmental intrusion. *Terry*, 392 U.S. at 9. To be reasonable under the Fourth Amendment, a pat-down search or frisk must be justified at its inception and must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. at 19-20.

The Eleventh Circuit has explained when a protective search may go beyond a frisk of the outer garments:

> When an officer reasonably believes that a suspect threatens his safety or the safety of others, he may search the suspect and seize concealed objects that he reasonably believes may be weapons or other instruments of assault. *See Terry*, 392 U.S. at 27, 29, 88 S.Ct. 1868. To frisk a suspect, an officer "conduct[s] a carefully

> limited search of the outer clothing of [the suspect] ... to discover weapons which might be used to assault him." *Id.* at 30, 88 S.Ct. 1868. And if an officer "feels a concealed object that he reasonably believes may be a weapon," he may continue the search beyond the outer clothing "by searching [the suspect's] pocket" and removing the concealed object. *Clay*, 483 F.3d at 743–44.

*United States v. Johnson*, 921 F.3d 991, 997 (11th Cir. 2019).

A protective frisk reasonably designed to discover weapons or other hidden instruments does not exceed its permissible scope. *Id*. A court must determine "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 998 (quoting *Terry*, 392 U.S. at 27). In this inquiry, "the totality of the circumstances—the whole picture—must be taken into account." *Id*. (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690 (1981). The court must only assess whether an officer acted reasonably in his circumstance, and not imagine alternative means by which the police objectives might have been accomplished. *Id*. at 1000. The reasonableness of the frisk's scope is connected to the justification for the frisk, and the frisk must be carefully limited to serve that justification but must not be so limited that officers cannot take reasonable actions in furtherance of officer safety and the safety of others. *Id*. "As the *Terry* Court made clear, we cannot "deny the

officer the power to take necessary measures ... to neutralize the threat of physical harm." *Id.* (quoting *Terry*, 392 U.S. at 24).

The protective search in this case—which combined outer garment touching and reaching into pockets to retrieve items as needed to be able to locate the pocketknife or other weapon—did not go beyond what was necessary to determine if Bracknell was armed, and was reasonable under the circumstances. The items Limoges removed from the pockets blocked or hindered his ability to feel the pocketknife or any other weapon concealed in Bracknell's cargo shorts or under his pants. Furthermore, to protect himself and his fellow officers, Limoges needed to either find the pocketknife, or conduct a search that was sufficient to alleviate the fear that Bracknell had a pocketknife in his possession, as he indicated. It was reasonable to reach into the pockets and remove items that could prevent the pocketknife from being detected during the patdown, and to empty the pockets, if needed.

Officer Limoges discovered the sock containing methamphetamine during the protective search, before he determined that Bracknell did not possess the pocketknife or any other weapon. The absence of a weapon does not render the protective search unreasonable.

## VI. Seizure of the Non-Anatomical Bulge Discovered During the Protective Search Was Justified by Plain Feel

Police may, under certain circumstances, seize contraband detected during the lawful execution of a *Terry* search. When an officer recognizes contraband, he cannot be required to ignore it, and may seize it under the "plain-view" doctrine. *Michigan v. Long*, 463 U.S. 1032, 1049-1050, 103 S.Ct. 3469, 3480-3481 (1983). However, if the officer lacks probable cause to believe that an object in plain view is contraband without conducting some further search of the object, the seizure is not justified under the plain-view doctrine. *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149 (1987). To justify the warrantless seizure of contraband, the item must be in "plain view" and its incriminating character must also be immediately apparent. *Horton v. California*, 496 U.S. 128, 136-137, 110 S.Ct. 2301, 2308 (1990).

The plain view doctrine applies by analogy to cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search, because if an officer observes it from a lawful vantage point, no invasion of a legitimate expectation of privacy, and thus no Fourth Amendment "search" independent of the initial intrusion occurs. *Dickerson*, 508 U.S. at 374-375. Seizure of contraband without a warrant under such circumstances is justified because resorting to a neutral magistrate would often be impracticable, and requiring magistrate approval would do little to promote

the objectives of the Fourth Amendment. *Id*. "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." *Id*. at 375-376. Police may seize contraband detected through the sense of touch during a protective patdown search if the search stays within the bounds marked by *Terry*.[6] *Dickerson*, 508 U.S. at 375-377.

The term "immediately apparent" means anytime in the course of a search conducted within the bounds of *Terry. See Dickerson,* 508 U.S. at 377 ("Thus, the dispositive question before this Court is whether the officer who conducted the search was acting within the lawful bounds marked by *Terry* at the time he gained probable cause to believe that the lump in respondent's jacket was contraband."). A seizure based on probable cause that develops during a patdown is proper provided the officer does not overstep the line by searching for contraband after the officer knows that no weapons are present.

[6] In *Dickerson*, the search of the defendant's jacket exceeded the bounds marked by *Terry* when the officer, after already knowing the jacket did not contain a weapon, determined a lump in the jacket was contraband only after squeezing, sliding, and manipulating it. *Dickerson*, 508 U.S. at 377-378.

*See U.S. v. Rogers*, 129 F.3d 76, 79 (2nd Cir. 1997). In *Rogers*, the court found that the officer acted within the bounds of a permissible protective patdown search and upheld the seizure of a bag with drugs when the officer had not yet been able to exclude the possibility that defendant possessed a weapon, felt an object in a coat pocket, manipulated the object for a few seconds to determine what it was, and ascertained it was contraband. The Second Circuit noted that the "immediately apparent" probable cause determination occurred despite the officer's concession that when he felt the item, he was only "fairly certain" it was contraband, but it was possible it was not contraband:

> Probable cause "merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items *may be* contraband." *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (plurality opinion) (citation and quotations omitted) (emphasis added). Officer Mason's fair certainty that what he felt in Rogers' pocket was contraband, coupled with Rogers' suspicious conduct, would warrant a person of reasonable caution to believe that drugs may be present, even without excluding the hypothesis that the contents could possibly be something else altogether.

*U.S. v. Rogers*, 129 F.3d at 79.

In this case, Officer Limoges was justified in retrieving the contraband he felt during the protective search. When he touched the non-anatomical bulge concealed in Bracknell's pants, he recognized it to be contraband by plain feel. While plain feel alone justifies the seizure, Limoges was also aware of other facts that reinforced his belief that the item was contraband before he

seized it. He was aware of Bracknell's history of possessing narcotics, he knew that K-9 Woody had alerted at the center of Bracknell's scooter—an area directly below where Bracknell was standing while he drove the scooter, he observed Bracknell acting nervously, and he felt Bracknell pull away when he placed his hand on the non-anatomical bulge. Based on his knowledge, training, experience, and the totality of circumstances, it was immediately apparent to Officer Limoges that the item was contraband before he seized it.

**CONCLUSION**

For the foregoing reasons, the defendant's motion should be denied.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By: */s/ Michael C. Sinacore*
Michael C. Sinacore
Assistant United States Attorney
Florida Bar No. 868523
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6396
Facsimile: (813) 274-6178
E-mail: michael.sinacore@usdoj.gov

**U.S. v. Michael Phillip Bracknell Case No. 8:26-cr-139-KKM-AEP**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

*/s/ Michael C. Sinacore*
Michael C. Sinacore
Assistant United States Attorney
Florida Bar No. 868523
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6396
Facsimile: (813) 274-6178
E-mail: michael.sinacore@usdoj.gov