**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,
Plaintiff,

Case No. 8:26-cr-139-KKM-AEP

v.

MICHAEL PHILLIP BRACKNELL,
Defendant.
_______________________________________/

**MEMORANDUM IN SUPPORT OF THE MOTION TO SUPPRESS**

Michael Phillip Bracknell submits this memorandum in support of his motion to suppress (Doc. 25), following the September 28, 2026 evidentiary hearing. The methamphetamine was discovered during an escalating search of his clothing: repeated pocket entries, removal and opening of a film container, additional pocket searches, further touching of a concealed object, handcuffing, and access beneath his pants. The Government must justify the intrusions that produced the evidence, not merely the initial encounter.

The principal ground for suppression survives acceptance of the Government's account of the traffic violations, a canine alert, and even a reasonable misunderstanding about a pocketknife. A protective search for that knife did not authorize an evidentiary search of every pocket or opening a container that posed no weapons concern. Nor could the officers derive lawful arrest authority from information obtained through an unlawful intrusion and

use that authority to validate the continuing search. Plain feel and inevitable discovery require lawful access to the incriminating information; neither dispenses with that requirement.

The defense also challenges the particular canine alert and the asserted extension of authority from the scooter to its operator. The credibility of the alleged traffic infraction and extension of the traffic stop to allow a dog sniff remain additional independent.

## I. PROPOSED FINDINGS OF FACT

### A. The traffic stop and overlapping canine investigation.

The Court heard testimony from Ofc. Upchurch, Ofc. Chimeri, and Ofc. Limoges on September 28. Doc. 44. The defense proposes the following findings, with the disputed matters identified rather than resolved by treating counsel's characterizations as testimony.

1. Officers Morgan Upchurch, Steven Chimeri, Emile Limoges, and K9 Woody worked together as a proactive team. Their practice included deploying the canine during traffic stops. Ofc. Upchurch Dep. 5:9–6:15; Ofc. Chimeri Dep. 20:22–21:4; Ofc. Limoges Dep. 10:1–9. They knew Mr. Bracknell from prior contacts and selected a dead-end location because they associated him with flight. Ofc. Upchurch Dep. 7:21–8:11; Ofc. Chimeri Dep. 9:9–18.
2. Ofc. Upchurch described violations near Wawa and the Quality Inn/AmeriWash area; Ofc. Chimeri described violations at the

convenience-store exit and near NAPA. Ofc. Upchurch Dep. 6:17–8:11; Ofc. Chimeri Dep. 9:22–10:15. Officers testified with generally consistent accounts regarding existing signs, including at least two on public Main Street. The asserted failures to stop were not captured on the available recordings and Ofc. Upchurch testified he had the ability to record the traffic violations and chose not to.

3. The video places Mr. Bracknell's first appearance on Gov. Ex. 3 at 15:41:23, activation of emergency lights at approximately 15:41:53, and the completed stop on Sylvan Lane at approximately 15:42:06. Ofc. Limoges was present shortly after the stop. Mr. Bracknell still controlled the scooter during the discussion about its kickstand at 15:42:57. Gov. Ex. 1, 3–5. The officers described stop-sign violations to him, and he disputed them. Gov. Ex. 2 Tr. 1:7–15; Gov. Ex. 4 Tr. 4:11–24.

4. At approximately 15:43:30, Ofc. Chimeri said he had not decided whether to issue a ticket. Gov. Ex. 4, 15:43:30; Gov. Ex. 4 Tr. 2:11–16. The depositions describe awaiting records information, without writing a citation. Ofc. Upchurch Dep. 8:14–23, 14:11–13; Ofc. Chimeri Dep. 10:16–11:1.

5. The scooter was placed against a utility-pole guy wire at approximately 15:44:20. Ofc. Limoges left to retrieve K9 Woody at 15:44:23; K9 Woody emerged at 15:44:57. At approximately 15:44:55, Ofc. Chimeri's laptop displayed Mr. Bracknell's photograph and DAVID information,

confirming this information had been retrieved prior to the stop. The officers already knew his identity and did not ask him his name or for an ID card. Ofc. Chimeri requested a "29P" at approximately 15:45:15, during this request he reads information from the laptop screen.[1] Gov. Ex. 4–5, Gov. Ex. 4 Tr. 3:14–16; Ofc. Chimeri Dep. 18:15–21. The Government places the request at 15:45:21. Doc. 34 at 5. Either time substantially overlaps the sniff. Radio traffic at approximately 15:46:22–25 is indeterminate as to whether it is a return on this "29P" inquiry.

6. The sniff occupied approximately 15:45:15–23. Ofc. Limoges described a change of demeanor, bracketing, and a final stop or stare toward the scooter's center. Ofc. Limoges Dep. 8:11–9:5, 11:8–18. Gov. Ex. 1 and 5 videos reveal instead three redirections at approximately 15:45:15, :17, and :19, a bodily shake at :21, and praise and a toy reward beginning around :23, without an identifiable freeze, stop or stare. Gov. Ex. 1, 5.

7. K9 Woody's return to the police vehicle followed the reward; the Government places that return at 15:46:11. Doc. 34 at 4–5. By approximately 15:46:27, Ofc. Limoges and Ofc. Chimeri discussed reading Mr. Bracknell his rights and positioning themselves. Gov. Ex. 4–5, 15:46:27;

[1] Police code 10-29 is a records check for wanted or stolen status. "P" in this context indicates this is a person check, i.e. a search for wants or warrants against a person.

Gov. Ex. 4 Tr. 3:23–25. Testimony described that a nod understood to communicate an alert and Gov. Ex. 4 shows Ofc. Chimeri asking Ofc. Limoges "Are we good?" with Ofc. Limoges responding "Yeah." *Id*. At approximately 15:47:46, Ofc. Chimeri advised Mr. Bracknell of his rights and explained that the canine had indicated an odor, not necessarily drugs actually on the scooter; he described a detention rather than an arrest. Gov. Ex. 4 Tr. 5:1–16.

**B. The knife exchange and successive intrusions into clothing.**

8. Before the frisk, the officers described irritation or agitation, but no visible weapon or threatening conduct. Ofc. Upchurch Dep. 9:10–23; Ofc. Chimeri Dep. 12:4–21, 13:4–24; Ofc. Limoges Dep. 12:17–13:6. Ofc. Upchurch described generally treating people as armed; Ofc. Chimeri and Ofc. Limoges described protective patdowns associated with narcotics investigations. Ofc. Upchurch Dep. 10:1–9; Ofc. Chimeri Dep. 16:20–17:2; Ofc. Limoges Dep. 17:4–16. Those general practices explain their approach, but do not supply a finding that this individual was dangerous.

9. At approximately 15:48:10, Ofc. Limoges asked about anything that could poke, stick, or hurt him. The supplied Gov. Ex. 5 transcription records a negative response, followed by Ofc. Limoges asking "Huh?" and directing Mr. Bracknell to spread his feet. Gov. Ex. 5 Tr. 3:11–16. Counsel hears Mr. Bracknell state "No I ain't got a pocket knife or nuthin'" at approximately

15:48:13, accompanied by tapping the left cargo pocket. Gov. Ex. 5. Ofc. Limoges instead said he understood Mr. Bracknell to announce a knife. Ofc. Limoges Dep. 14:4–23. Ofc. Chimeri heard no such announcement; Ofc. Upchurch explained that engine noise interfered with his hearing and that Ofc. Limoges later supplied the knife account. Ofc. Chimeri Dep. 14:22–15:7; Ofc. Upchurch Dep. 11:4–18, 13:15–24. No knife was subsequently found.

10. Gov. Ex. 5 places the initial external pat at 15:48:19 and pocket entry at 15:48:21. Gov. Ex. 5. It records a wallet removed at :29, reentry at :32, a film canister removed at :37, and opening at :39. *Id*. Another entry at :46 produced a baggie at :54, reportedly without contraband. Gov. Ex. 2, Gov. Ex. 5, 15:48:19–54. Ofc. Limoges's deposition confirms that he entered the left cargo pocket looking for a knife, but ultimately found no weapon. Ofc. Limoges Dep. 14:4–15:10. He acknowledged: "I did not feel anything in his pockets that amounted to a weapon at that time, no. I only had his word." *Id*. 16:14–18.

11. During the hearing Ofc. Limoges testified that he specifically disclaimed a belief that the film canister contained a weapon. Gov. Ex. 5 then records a rear-pocket search and wallet removal at 15:49:09–11, an upper-front-pocket entry and removal of coins at 15:49:20–23, and renewed searching at 15:49:28. Gov. Ex. 5. This timing matters because the challenged touch

and discovery of the methamphetamine occurred after those intrusions, not at the initial patdown.

12. Ofc. Upchurch's deposition asserts that Mr. Bracknell denied having a prescription. Ofc. Upchurch Dep. 14:23–15:1. But the Gov. Ex. 5 transcription places "Yeah" after the repeated prescription question, followed by unintelligible speech; Gov. Ex. 2 records a statement about obtaining the pills in the mail. Gov. Ex. 5 Tr. 3:23–4:2; Gov. Ex. 2 Tr. 5:2–6. Gov. Ex. 4 records discussion of looking up the drug, and later Ofc. Upchurch says he had not finished doing so when the trafficking discovery was announced. Gov. Ex. 4 Tr. 6:14–16, 9:10–15. The Court should resolve the prescription exchange from the recording rather than assume an admission of unlawful possession.

**C. The concealed sock, restraint, and subsequent disposition.**

13. Gov. Ex. 5 shows that Ofc. Limoges discovers the bulge and says "What is that?" at approximately 15:49:32, the direction not to pull away at :35, and handcuffing at :40. Gov. Ex. 5. Ofc. Limoges's deposition describes a non-anatomical bulge, a movement away, handcuffs, loosening the belt, and passing a recovered sock to Ofc. Chimeri. Ofc. Limoges Dep. 19:22–20:16. It does not describe an immediately recognizable rocky texture, which is inconsistent with his testimony in Court.

14. During the hearing, Ofc. Limoges claimed immediate tactile identification of rocky texture. His contemporaneous report characterizes what he felt as contraband, but gives no comparable tactile explanation and describes visual identification of crystalline material after recovery. Gov. Ex. 5 shows recovery at approximately 15:50:31, after restraint and access beneath the pants; the Government uses 15:50:29. Doc. 34 at 9. Gov. Ex. 5 depicts a sock tied by string to an interior loop in the shorts.
15. Ofc. Chimeri placed the personal search before the scooter search and said no contraband was recovered from the scooter. Ofc. Chimeri Dep. 16:9–19, 19:23–20:16.

## II. EACH INTRUSION REQUIRES ITS OWN CONSTITUTIONAL JUSTIFICATION

Mr. Bracknell challenges a seizure and searches of his own body, clothing, and effects. A warrantless evidentiary search is presumptively unreasonable unless an established exception applies. *Minnesota v. Dickerson*, 508 U.S. 366, 372–73 (1993). A traffic detention does not itself authorize a frisk: an officer must reasonably suspect that the person is armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009). And a frisk justified at inception must remain reasonably related to its protective purpose. *Terry v. Ohio*, 392 U.S. 1, 19–20, 29–30 (1968).

The Government bears the burden of establishing that a warrantless search falls within a recognized exception. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983). It must identify the applicable exception and its factual predicates at each stage. The Government's theory in this search requires stacking inferences upon inferences: an alert authorizing a scooter search, a belief justifying a weapons patdown, probable cause supporting arrest, and an inevitable lawful discovery are different propositions. None follows automatically from the preceding one. The ultimate recovery cannot supply the missing justification retrospectively.

## III. A REASONABLE MISTAKE OF FACT DID NOT AUTHORIZE THIS EVIDENTIARY SEARCH

### A. The disputed words must be evaluated together with the gesture.

Fourth Amendment reasonableness permits factual mistakes, but only objectively reasonable ones. *Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014); *Illinois v. Rodriguez*, 497 U.S. 177, 185–86 (1990). The inquiry is not whether a knife was ultimately found or whether Ofc. Limoges sincerely recalls hearing one mentioned. It is whether the circumstances reasonably conveyed an affirmative admission.

The defense asks the Court to credit the recorded negative answer. A pocket tap accompanying a denial can identify the pocket under discussion without admitting a weapon. The Government's inference should be evaluated

against the entire exchange, including the negative words appearing in the USAO transcript and Ofc. Limoges's request for clarification. The other officers' inability to corroborate an affirmative answer is relevant, though their different positions and the engine noise prevent treating that inability as conclusive. Nor does repeated listening under controlled conditions establish what an officer necessarily could hear in real time.

Apart from the asserted knife statement, the initial justification was limited. Prior flight history, irritation, baggy clothing, and a canine odor indication may contribute to the circumstances, but a routine practice of frisking everyone after an alert cannot replace an individualized safety determination. *United States v. Bishop*, 940 F.3d 1242, 1248–50 (11th Cir. 2019), upheld a frisk based on a combination of particularized circumstances, including current drug information and conduct during the encounter. Here, the officers identified no visible weapon or threatening act before the search began. The later movement and bulge cannot be moved backward in time to justify the initial pocket entry.

**B. The Court can assume a reasonable mistake and still suppress.**

A reasonably understood announcement of a knife, reinforced by a gesture toward a pocket, could justify securing that pocket without requiring an officer to ignore the announcement until a weapon's precise outline was felt. The defense argues that the resulting authority remained limited to addressing the reasonable weapons concern.

*United States v. Clay*, 483 F.3d 739, 743–44 (11th Cir. 2007), illustrates that limit. After seeing a shotgun, an officer felt a long, thin object that might be a screwdriver and removed it. The court upheld the intrusion because the initial patdown supplied an objectively reasonable weapons concern. *Clay* did not authorize emptying pockets merely because officers were investigating drugs. Here, Ofc. Limoges admitted that none of the objects he felt amounted to a weapon; his asserted knife information must therefore carry the justification for the particular multiple additional unreasonable intrusions.

Nor does *United States v. Johnson*, 921 F.3d 991, 997–1001 (11th Cir. 2019) (en banc), establish unrestricted pocket-search authority. It upheld removal of ammunition and a holster during a protective search under the concrete circumstances of an unsecured, dark, early-morning burglary investigation. It rejects an artificially narrow safety analysis, including the proposition that an object must itself be a complete weapon to be removed. But it preserves the necessary relationship between the object, the circumstances, and protection from harm. A wallet, loose change, and a film canister, during a bright clear day, require their own contextual explanation.

The Government argues that removing objects facilitated finding the knife. Doc. 34 at 2, 14–16. That could justify moving an obstructing object if reasonably necessary to reach a suspected knife. It does not follow that each pocket could be explored for evidence or that a removed, innocuous container could be opened.

The Court should distinguish securing a suspected weapon, temporarily moving an obstruction, and inspecting the contents of personal effects. The third step requires justification beyond the first two.

The film canister is the clearest dividing point. Even assuming its removal was reasonably necessary, opening it was a separate intrusion. A finding that Ofc. Limoges did not believe it contained a weapon defeats a weapons rationale for inspecting its contents. An opaque film container does not reveal an unlawful drug by its contour alone, and ordinary medication is not inherently contraband. No scooter-based automobile exception transferred to a container carried in Mr. Bracknell's clothing. No consent to opening it is identified. And the Government cannot use information first acquired by opening the container to justify that opening.

The later pocket entries compound the problem. The prolonged rummage through Mr. Bracknell's pockets without finding a weapon did not justify the officer's continued search. The relevant question is what reasonable weapons concern remained and why the specific intrusion addressed it. On the proposed chronology, the officer had progressed into an evidentiary search before the touch said to identify methamphetamine.

## IV. PLAIN FEEL DEPENDS ON LAWFUL TOUCH BEFORE PROBABLE CAUSE ARISES

Under *Dickerson*, an officer conducting a lawful weapons patdown may seize contraband whose contour or mass supplies probable cause without an additional evidentiary exploration. But continued manipulation after the weapons justification has ended is impermissible. *Dickerson*, 508 U.S. at 375–79. This is not a demand for certainty, a chemical identification at first contact, or a verbal announcement using the word “methamphetamine.” It is a requirement that the incriminating information be acquired within a lawful search.

The Government’s own response describes two contacts with the bulge: an initial touch, pulling away and restraint, then another touch said to reveal crystals. Doc. 34 at 2, 8–9. Hearing testimony describes immediate recognition of rocky texture. Hearing testimony was also that Ofc. Limoges felt the rocky texture through the thinner pocket liner material The Court should identify the actual point of claimed recognition, the location of the officer’s hand, what clothing and packaging intervened, what manipulation occurred, and what lawful safety purpose remained at that point. Those findings determine whether plain feel applies; the label “non-anatomical bulge” does not answer them.

The deposition described a bulge but no distinctive tactile identification of drugs. The recording transcripts describe further searching and something tied beneath the shorts. The police report calls the object contraband, but explains no

diagnostic contour or mass before its later visual identification. Taken together, these sources support finding that the officer recognized an unexplained object, investigated it further, and only then established its incriminating character. The Court should assess the hearing's additional texture explanation against that sequence rather than regard it as sufficient by itself.

The Government relies on *United States v. Rogers*, 129 F.3d 76, 78–79 (2d Cir. 1997). There, the defendant conceded the lawful patdown and removal of a bag; brief manipulation while the officer still could not exclude a weapon supplied probable cause, together with suspicious conduct. The court expressly preserved the requirement that probable cause arise within the bounds of the weapons search. Here, the legality of the preceding pocket entries is disputed, and the alleged tactile identification came only after repeated fruitless searches for a weapon. *Rogers* permits reasonable weapons assessment; it does not license a drug search to generate its own probable cause.

The Government's plain-feel theory fails at its threshold: Ofc. Limoges obtained the claimed tactile information through an unlawful pocket search. By the time he purportedly recognized a "rocky texture," he had already progressed beyond a protective patdown into repeated entries into Mr. Bracknell's pockets and examination of their contents. Even crediting his claimed recognition, that recognition cannot justify the intrusion that produced it. Plain feel permits seizure of contraband identified during a lawful weapons frisk; it does not

permit an officer to search inside clothing for evidence and then invoke what his fingers discover as justification for being there. *Dickerson*, 508 U.S. at 375–79.

Neither Mr. Bracknell's subsequent movement nor Ofc. Limoges's later reference to a possible gun retroactively authorizes the preceding pocket exploration. The constitutional defect therefore precedes any dispute about the texture of the concealed object or the mechanics of retrieving it. Because the asserted probable cause arose only after Ofc. Limoges exceeded the lawful bounds of a weapons search, plain feel cannot sustain the seizure, and the methamphetamine must be suppressed.

## V. THE UNLAWFUL OPENING OF THE FILM CANISTER CANNOT JUSTIFY THE ENSUING SEARCH

Even assuming Ofc. Limoges lawfully removed the film canister while looking for a knife, that removal did not authorize him to open it. Ofc. Limoges admitted that he did not believe the canister contained a weapon. That admission forecloses any protective justification for inspecting its contents. A weapons frisk must remain confined to its protective purpose; it does not authorize examination of personal effects after the asserted weapons concern has been eliminated. *Terry*, 392 U.S. at 29–30; *Dickerson*, 508 U.S. at 378–79. Absent an independent justification for searching its contents, the canister had to remain closed.

The Government's reliance on Viagra skips over that constitutional defect. It must establish a lawful basis for opening the canister that existed before the opening, not one supplied by what the search revealed. Even if the pills, once discovered, suggested a prescription-drug offense, information obtained through an unlawful search cannot supply an independent justification for continuing that search. *Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963).

*Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980), does not permit that circular reasoning. It allows a search shortly before formal arrest when independent probable cause already exists; it does not allow the search itself to manufacture the necessary cause. The officers could not open a container they acknowledged posed no weapons concern, discover medication inside, and then use that discovery to authorize the increasingly intrusive search of Mr. Bracknell's clothing. The Viagra obtained through that unlawful inspection cannot rescue the search that followed.

**VI. INEVITABLE DISCOVERY REQUIRES A PROVEN LAWFUL PATH**

The Government must prove by a preponderance that lawful means already being actively pursued would have produced the evidence without the constitutional violation. *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Watkins*, 13 F.4th 1202, 1211–13 (11th Cir. 2021). It has not established that lawful path here.

The analysis begins with the limitation the Government's theory overlooks: an alert to the scooter did not itself authorize searching Mr. Bracknell's person. Authority to search a conveyance does not automatically extend to the clothing and pockets of its occupants. *Wyoming v. Houghton*, 526 U.S. 295, 303 & n.1 (1999). The Government therefore cannot assume that the canine alert made a search inside Mr. Bracknell's clothing inevitable.

Even assuming a lawful external weapons patdown would have followed, the Government has not shown that it would have supplied a lawful basis to reach inside his clothing. It has not established that touching the concealed sock through the exterior clothing would have produced either an objectively reasonable belief that it contained a weapon or probable cause to identify it as contraband. Ofc. Limoges's claimed recognition of a rocky texture during the challenged pocket search does not establish what a properly limited external patdown would have revealed. The Government's theory thus depends on carrying information acquired through the unlawful intrusion into the hypothetical lawful frisk. Without that information, the necessary basis for entering the clothing remains unproven. Discovery was possible; the Government has not proved it was inevitable.

## VII. THE OFFICERS' ROUTINE CANINE INVESTIGATION DID NOT ESTABLISH THE CLAIMED ALERT

### A. Routine deployment cannot substitute for diligent traffic enforcement or justification for further intrusion.

The hearing testimony established that this team deployed K9 Woody during almost every traffic stop. The canine investigation was therefore part of a standing practice of using ordinary traffic encounters to investigate motorists for drugs. That practice risks making the traffic mission secondary and subjecting citizens to indiscriminate investigatory harassment. Its routine nature warrants scrutiny of whether the officers actually pursued the traffic investigation diligently and whether each additional intrusion had an adequate factual basis.

An exterior canine sniff may occur during an otherwise lawful traffic stop, but officers may not prolong the detention for that purpose without independent reasonable suspicion. *Illinois v. Caballes*, 543 U.S. 405, 408–09 (2005); *Rodriguez v. United States*, 575 U.S. 348, 354–57 (2015). Making narcotics investigations routine does not enlarge those constitutional limits or transform time spent pursuing drugs into time reasonably necessary to resolve a traffic violation.

When an encounter produces no evidence and ends without charges, there is no resulting criminal prosecution in which the motorist can move to suppress. Release does not undo an unjustified detention or search, and the absence of a suppression proceeding does not validate the officers' conduct. Here, the Court has the opportunity to examine the practice through the actual recording. The

eventual discovery of drugs cannot substitute for proof that the preceding intrusions were justified when they occurred.

**B. The video contradicts the specific alert Ofc. Limoges described.**

Ofc. Limoges described a stop and stare, or freeze, as the behavior supporting his conclusion that K9 Woody alerted. The recording contradicts that account. During the brief sniff, Ofc. Limoges repeatedly redirects K9 Woody toward the scooter. K9 Woody then shakes his body, and Ofc. Limoges begins praising and rewarding him. The stop, stare, or freeze described in the testimony does not occur. Gov. Ex. 1 and 5, 15:45:15–23. The recording provides a sufficiently clear view to distinguish the claimed stationary response from the movement actually shown.

*United States v. Braddy*, 11 F.4th 1298, 1312–14 (11th Cir. 2021), does not require a formal final response or video confirmation of every alert. But it leaves the trial court responsible for deciding whether to credit the handler's account. Mr. Bracknell asks the Court to reject this account because the observable behavior Ofc. Limoges described is contradicted by the recording, not to impose a universal requirement that every narcotics dog freeze before probable cause can arise.

The distinction is decisive. Praise, a reward, or a nod to another officer communicates the handler's conclusion; none establishes that the behavior offered to support that conclusion actually occurred. The Court should credit the

recording and find that the Government failed to establish the claimed alert. That unproven alert cannot supply the justification for the ensuing narcotics detention and search.

## VIII. PRETEXT DOES NOT EXCUSE INADEQUATE PROOF OR MANUFACTURED DELAY

*Whren v. United States*, 517 U.S. 806, 810, 813 (1996), permits a traffic stop supported by an objective justification even when officers seek evidence of another crime. It does not require the Court to accept the asserted justification without scrutinizing the evidence supporting it. Although pretext does not formally increase the Government's burden or make corroboration mandatory, the circumstances here warrant close examination of the officers' credibility and their decision to leave the alleged violations unrecorded.

These officers belonged to a proactive street-crime enforcement unit and regularly used traffic stops to initiate narcotics investigations. Ofc. Upchurch acknowledged that he had the ability and opportunity to record an alleged violation but chose not to activate his camera. When officers deliberately use minor traffic infractions as the basis for broader intrusion into citizens' lives, the Court should expect them to explain why readily available objective corroboration was not obtained. Their decision deprived the Court of evidence

capable of confirming or contradicting the very conduct offered to justify the seizure.

That omission does not itself establish fabrication. But Mr. Bracknell need not prove that the officers lied before the Court may question whether their testimony establishes the asserted basis for the stop. The absence of affirmative proof of fabrication is not affirmative corroboration of their account. The Court should weigh the opportunity to record, the conscious decision not to do so, and the officers' investigative objective when deciding whether their uncorroborated account deserves credit.

Even if the Court finds the initial stop justified, the pending wants-and-warrants inquiry does not resolve whether the detention was unlawfully prolonged. *Rodriguez*, 575 U.S. at 354–57, permits the time reasonably necessary to address the traffic violation and complete related tasks with reasonable diligence. Those tasks include deciding whether to issue a ticket and conducting appropriate identification, warrants, registration, and insurance checks. A narcotics investigation is a separate undertaking. Under *United States v. Campbell*, 26 F.4th 860, 881–85 (11th Cir. 2022) (en banc), an unrelated inquiry violates that limit when it adds time without independent reasonable suspicion.

A canine sniff may overlap a diligently pursued records inquiry without extending the stop. *Braddy*, 11 F.4th at 1310–12. But overlap at the moment of the sniff does not establish diligence throughout the detention. Officers cannot defer

ordinary traffic work to arrange a narcotics investigation and then rely on the unfinished work to justify keeping the motorist detained. The relevant question is when the traffic tasks reasonably should have been completed, accounting for any time actually added by the unrelated investigation.

Here, more than three minutes elapsed between the stop at approximately 15:42:06 and the dispatch request at approximately 15:45:15, despite the officers' prior recognition of Mr. Bracknell. During that interval, the scooter was positioned to arrange the sniff and K9 Woody was retrieved; the dispatch request substantially coincided with the beginning of the sniff. Gov. Ex. 1, 15:42:06; Gov. Ex. 4–5, 15:44:20–15:45:23. The Court should determine whether arranging the sniff displaced traffic work and added time to the detention. The DAVID display does not establish that the warrants inquiry was already complete, but neither does the later dispatch request establish that the inquiry was diligently initiated.

The same scrutiny applies to the subsequent coordination, *Miranda* warnings, and personal search. If the claimed alert is rejected, it cannot supply an independent basis for extending the detention into a narcotics investigation. The Government must then justify the continued seizure by reference to traffic work reasonably remaining, rather than work left unfinished while officers pursued

drugs. A pending warrants inquiry permits genuine overlap; it does not excuse manufactured delay.

**IX. RELIEF REQUESTED**

The Court should suppress the methamphetamine because the personal search exceeded its protective purpose and the Government has not established untainted probable cause, lawful plain feel, or inevitable discovery. The challenged alert and detention supply additional grounds upon the corresponding factual findings.

The Court should also suppress the pills and other physical evidence obtained through unlawful intrusions, and statements and derivative evidence shown to result from their exploitation. *Wong Sun*, 371 U.S. at 484–88; *Brown v. Illinois*, 422 U.S. 590, 601–04 (1975). The motion to suppress should be granted.

Respectfully submitted,
**CHARLES L. PRITCHARD, JR.**
**FEDERAL PUBLIC DEFENDER**

/s/ Ryan J. Maguire
Ryan J. Maguire
Assistant Federal Defender
Florida Bar No. 117534
400 North Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Facsimile: (813) 228-2562
Email: ryan_maguire@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 9, 2027, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record including:

Michael Sinacore, AUSA

/s/ Ryan J. Maguire
Ryan J. Maguire
Assistant Federal Defender