UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 8:26-cr-139-KKM-AEP

MICHEAL PHILLIP BRACKNELL

**UNITED STATES' REPLY MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by Gregory W. Kehoe, United States Attorney for the Middle District of Florida, following the evidentiary hearing on September 28, 2026 on the defendant's motion to suppress (Doc. 25), continues to oppose the motion to suppress and files this reply to Bracknell's Memorandum in Support of the Motion to Suppress (Doc. 49).

The testimony and evidence presented during the hearing established that law enforcement officers acted reasonably and lawfully when they detained Bracknell for traffic violations, conducted a K-9 sniff that resulted in an alert and probable cause for a narcotics investigation, and conducted a protective search to find a weapon on Bracknell—specifically, a pocketknife that Officer Emile Limoges reasonably believed Bracknell possessed in his pants. During the protective search, Officer Limoges discovered, through plain feel, methamphetamine concealed in Bracknell's pants. The law enforcement

actions were reasonable and did not violate the Fourth Amendment. Furthermore, the methamphetamine is not "fruit of the poisonous tree," it inevitably would have been discovered through a routine protective search, and suppression of evidence is not necessary or appropriate in this case.

**STATEMENT OF FACTS**

The testimony and evidence presented during the evidentiary hearing included the facts outlined in the Statement of Facts in the United States' Response in Opposition to Defendant's Motion to Suppress (Doc. 34). That recitation of facts, which included the times of specific events as recorded on body camera and dash camera videos, is hereby incorporated by reference. The following is a summary of the facts based on the testimony of Detective Upchurch, Detective, Chimeri, and Officer Limoges during the hearing, and the evidence from the dash camera and body camera videos (Government Exhibits 1 through 5) which were published and explained during the hearing.

Detective Upchurch stopped Bracknell for traffic violations he and his partner, Det. Chimeri, observed, including Bracknell failing to stop at multiple stop signs. Upchurch got out of his police vehicle, informed Bracknell that he ran a bunch of stop signs, and told him the locations of the violations. Bracknell did not dispute that he ran the stop signs, but said, "I just went through the parking lot" and "I'm just coming through the parking lot."

Chimeri arrived, exited his police vehicle, explained to Bracknell that he was required to stop his scooter at the stop signs, and asked him, "You didn't know that?" Bracknell replied, "Damn." They then discussed where to place Bracknell's scooter, and Bracknell leaned it against a utility pole support wire in an upright position.

As Officer Limoges went to his vehicle to collar his K-9 partner, Woody, and begin the process of a K-9 sniff on the scooter, Chimeri and Bracknell walked toward Chimeri's police vehicle. Chimeri instructed Bracknell to stand in front of his vehicle. He then entered his vehicle and called in a wants and warrants check. Within seconds of Chimeri using his radio to request information on Bracknell, Woody alerted to the center area of the scooter and gave a final response indicating the presence of the odor of narcotics. Limoges put Woody back in his vehicle and approached Chimeri's vehicle. While the warrants check was still pending and the traffic investigation was ongoing, Officer Limoges communicated his findings to Det. Chimeri. They began discussing how they would proceed with a narcotics investigation, and during those discussions, Chimeri received information from the wants and warrants check.

After Chimeri advised Bracknell of his *Miranda* warnings (thereby clearly explaining to him the shift in the investigation from a traffic

investigation to a narcotics investigation), the officers positioned themselves for the protective search. Limoges asked Bracknell a question to determine whether he possessed a weapon. Limoges understood Bracknell to say, and to indicate by nodding and gesturing to his left front pocket, that he had a pocketknife. Based on his belief that Bracknell had a weapon on the left side of his shorts, Limoges began patting down and searching pockets on the left side of the pants to find and remove the pocketknife. He removed items from the pockets to allow him to continue to search for the pocketknife he believed Bracknell possessed. When he removed one of the items, a film container, Bracknell spontaneously stated that it was Viagra—a controlled substance that requires a prescription. Bracknell, when asked if he has a prescription, said that he got it in the mail. When Limoges placed his hand in the groin area near the top of the waistband, he felt and immediately detected the presence of methamphetamine crystals in an item described as "a non-anatomical bulge." He detected the methamphetamine by touching the item with his index finger, which was outside the left front pocket, and his ring finger, which was inside the pocket. Limoges's body camera video shows Limoges touching the item and asking, "What is that?", Bracknell attempting to pull away, and Limoges saying "Mark! Mark!" (The transcript describes it as "Unintelligible" when Limoges said Bracknell's name two times.) After Bracknell was handcuffed for

officer safety, the body camera video records Limoges stating, "I'm searching these things further 'cause there's something inside the left side of his pocket. Right here." As he said, "Right here," Limoges placed his hand on the outside of Bracknell's shorts, just left of center and below the waistband. Limoges loosened Bracknell's belt and retrieved a sock that contained methamphetamine from under Bracknell's pants. Limoges explained how he needed to unbuckle the belt to loosen the pants and retrieve the sock, which was connected or looped to the top of the pants. On the body camera video, Limoges is recorded asking, "'You got something tied right here?" and stating, "There's something right under his shorts." The body camera recording shows Limoges pulling the item out from under Bracknell's underwear.

Limoges handed the sock to Chimeri, who felt the item, recognized it to contain methamphetamine, and pulled two plastic bags containing methamphetamine from the sock. He commented, "That is definitely a non-anatomical bulge."

The testimony of all three officers also established that the methamphetamine would have inevitably been discovered through a routine protective frisk conducted in the usual manner, had Officer Limoges not directed the protective search to the pockets on the left side of Bracknell's shorts based on his belief that Bracknell said he possessed a pocketknife in a

pocket on that side. Bracknell concealed the sock with methamphetamine in the groin area, and the sock was connected to the top of his shorts. That location is a common area for weapons to be concealed, and, according to the testimony of all three officers, it would have been an area covered during a routine frisk process—typically the first area patted down. Officer Limoges also explained how he detected the contraband through plain feel and immediately recognized methamphetamine crystals concealed in a "non-anatomical bulge." He did not touch that area searching for narcotics, but he felt it while checking for a weapon, and touched it with his index finger, which was outside Bracknell's pants, and his ring finger, which was inside the left front pants pocket. Upon touching it, he recognized it as methamphetamine.

Officer Limoges also testified about his extensive experience conducting protective frisks, and his familiarity with Bracknell. He made it clear that he believed that Bracknell indicated he possessed a pocketknife in a pocket on the left side of his pants when he asked Bracknell if he had anything on him that would poke him or hurt him. His body camera video clearly shows Bracknell, in response to the question, touching the left side of his pants with his left arm. Bracknell's verbal response, however, is not clear from the video, and the transcript reflects that he said he did not have anything on him.[1] Limoges,

[1] Bracknell's counsel has stated that he hears Bracknell state, "No I ain't got a pocket knife or nuthin," accompanied by tapping the left cargo pocket, at approximately

disputed the transcript and testified that he can hear Bracknell saying he had a pocketknife in the recording.

## LEGAL MEMORANDUM AND ARGUMENT

### I. The Traffic Stop Was Lawful Under *Terry v. Ohio*

A traffic stop is a constitutional detention if it is justified by reasonable suspicion under *Terry* or probable cause to believe a traffic violation has occurred under *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). The testimony established that Det. Upchurch and Det. Chimeri both saw Bracknell operating a vehicle—an electric scooter—and failing to stop at stop signs. The defendant asserts that because Det. Upchurch did not activate the car dash cam soon enough to record the traffic violations, his testimony, along with the testimony of Det. Chimeri, should be discredited. While Upchurch acknowledged that he could have activated the recording mechanism within a short period of time after observing the violations, but he did not think of doing so, Chimeri's testimony established that his vehicle was not positioned in a manner to capture the violations he observed on his vehicle's dash camera.

The officers' testimony clearly established that traffic violations occurred. And Bracknell's explanation that he was just going through parking

15:48:13, in Limoges's body camera video (Gov. Ex. 5). Doc. 49, ¶ 9.

lots, along with his response to Chimeri's explanation that the law required him to stop his scooter at stop signs (he said, "Damn"), are consistent with Bracknell knowing he had committed the violations.

The Court should decline Bracknell's request to discredit the officers' testimony because Upchurch did not activate his dash camera right after seeing the infractions. No law, rule, or agency protocol requires the recording and preservation of every traffic violation potentially captured by a law enforcement recording device. Moreover, at the moment Bracknell committed the violations, it had not yet been determined whether he would be cited, and the officers had no reason to presume Bracknell would ultimately be arrested. (Det. Chimeri ultimately decided not to issue citations.)

## II. The K-9 Sniff of Bracknell's Scooter Was Lawful

A seizure justified only by a traffic stop becomes unlawful if the stop is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation and attending to related safety concerns. *Rodriguez, v. United States*, 135 S.Ct. 1609, 1611 (2015); *Illinois v. Caballes,* 543 U.S. 405, 407, 125 S.Ct. 834, 837 (2005). The testimony and the body camera videos clearly show that the traffic stop was not delayed at all in this case. Officer Limoges and his partner K-9 Woody were on scene at the beginning stages of the traffic stop, and they completed the drug sniff within seconds of

Detective Chimeri getting in his police vehicle and requesting a "wants and warrants" check on Bracknell. Chimeri was aware of the K-9 alert before receiving the wants and warrants information, which came in at approximately the same time he and Limoges were discussing how they would proceed with a narcotics investigation.

The defendant's claim that Detective Chimeri prolonged the traffic investigation is refuted by the videos. It was reasonable, if not expected, for Chimeri and Upchurch to have an initial conversation with Bracknell to explain why he was stopped, and it was also reasonable to discuss finding a location for Bracknell to lean his scooter before Chimeri returned to his vehicle and called for a wants and warrants check. Limoges was already present and standing by waiting to commence the K-9 sniff , and he commenced the process of the K-9 sniff contemporaneous to Chimeri and Bracknell walking back to Chimeri's vehicle and Chimeri beginning the process of obtaining information about Bracknell.

Furthermore, if any delay in the traffic investigation occurred, it was not an unreasonable delay. Once a valid traffic stop is made, police may conduct a variety of checks on the driver and his vehicle, they may question the driver about the violation, they may request consent to search the vehicle, and they may run computer checks for outstanding warrants. *U.S. v. Simmons*,

172 F.3d 775, 778 (11th Cir. 1999). By the time K-9 Woody alerted in this case, the traffic investigation was still in the very early stages.

## III. Law Enforcement Had Probable Cause For a Narcotics Investigation

To determine whether or not a specific Fourth Amendment requirement such as probable cause or reasonable suspicion has been met, the court must determine if the law enforcement actions were reasonable. *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911 (1996). The officers reasonably commenced a narcotics investigation in this case. Officer Limoges testified that K-9 Woody, a trained and certified drug-detection dog, alerted on the center of the scooter, indicating an odor of narcotics in that area. Based on the alert, Limoges had probable cause that contraband was present on the scooter or on Bracknell, who had just been standing on the scooter and operating it immediately before the traffic stop. An alert from a trained drug-detection dog, in itself, provides probable cause for a search. *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006).

Based on the short amount of time the K-9 needed, and on Limoges directing Woody to the scooter, Bracknell questions whether Woody actually alerted to the odor of narcotics. But the Court should disregard Bracknell's invitation to second-guess Officer Limoge's determination regarding Woody's positive alert. As Officer Limoges explained, he and Woody were certified as a

team in narcotics detection. It is Limoges's duty to interpret the signals he observes from his K-9 partner and, based on their joint training and experience, interpret them. Here, Limoges interpreted Woody's reaction to the scooter to be an alert to the presence of an odor of narcotics. Furthermore, Limoges explained how directing the K-9 to areas to be searched is a routine part of their training, and no evidence suggests doing so was improper.

## IV. The Officers Were Justified in Conducting a Protective Search

For officer safety, a law enforcement officer may rely on the totality of the circumstances and make common sense conclusions to conduct a patdown search to find weapons if he reasonably believes or suspects an individual is armed and dangerous. *Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338 (1979); *United States v. Bishop*, 940 F.3d 1242, 1250 (11th Cir. 2019). Definitive evidence or an absolute certainty that the individual is armed is not required. *Bishop* at 1250. As to narcotics investigations, it is judicially recognized that individuals involved in narcotics trafficking are often armed, and weapons are "tools of the trade." *U.S. v. Martin*, 794 F.2d 1531, 1533 (11th Cir. 1986); *U.S. v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989).

Officer Limoges explained that he performed a protective search of Bracknell because they were conducting a narcotics investigation based on the probable cause established by the K-9 sniff. Based on his training and

experience, he understood the connection between narcotics offenses and weapons. He believed that Bracknell could have a weapon in his possession, and he conducted a protective search for weapons.

Limoges testified that he heard Bracknell say he had a pocketknife when he asked whether he had anything on him that would hurt him or poke him, and he saw Bracknell gesture to his left front pocket when he responded to the question. While it is difficult to discern Bracknell's verbal response in the recording, it is clear from the video that Bracknell responded by touching his left front pocket with his left arm. (Government Exhibit 5, at 15:48:12). Based on the totality of circumstances, Limoges's belief that Bracknell possessed a pocketknife was reasonable.

## V. A Reasonable Mistake of Fact Does Not Render the Search Unreasonable and Does Not Require Suppression of Evidence

Even if Officer Limoges was mistaken in his belief that Bracknell indicated he had a pocketknife inside the left side of his pants, such a mistake does not render his actions unreasonable and should not warrant suppression of evidence. When determining whether law enforcement made a reasonable assessment, great deference is given to the judgment of trained law enforcement officers. *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003). Such deference also applies when an officer makes a reasonable mistake of fact. *Id*. Agents of the government must not always be correct, but

they must be reasonable. *Illinois v. Rodriguez*, 497 U.S. 177, 185, 110 S.Ct. 2793 (1990). Determining whether an officer acted reasonably depends on the specific circumstances in each case, and an officer's mistaken assessment of fact does not, in itself, render his actions unreasonable. *Ornelas,* 517 U.S. at 695–696, 116 S.Ct. at 1661–62.

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.' " *Riley v. California,* 573 U.S. 134 S.Ct. 2473, 2482 (2014). The Fourth Amendment allows for some mistakes on the part of government officials, giving them "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302 (1949). Searches and seizures based on mistakes of fact can be reasonable. *See Illinois v. Rodriguez,* 497 U.S. at 186 (finding no Fourth Amendment violation when officers entered residence based on a reasonable mistake of fact regarding authority to consent.) But "the mistakes must be those of reasonable men." *Brinegar,* 338 U.S. at 176. A reasonable suspicion may include reasonable mistakes of fact, and may also rest on reasonable mistakes of law. *Heien v. North Carolina*, 574 U.S. 54, 135 S.Ct. 530 (2014).

In *Chanthasouxat*, the Eleventh Circuit held that an officer's reasonable mistake of fact may provide the objective grounds for reasonable suspicion or probable cause required to justify a traffic stop. *Chanthasouxat*, 342 F.3d at

1276. The court explained that a traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment. If an officer makes a traffic stop based on a mistake of fact, the only question is whether the mistake of fact was reasonable, and great deference is given to the judgment of the trained law enforcement officers on the scene. "The principal components of a determination of reasonable suspicion or probable cause will be ... viewed from the standpoint of an objectively reasonable police officer...." (citing *Ornelas,* 517 U.S. at 696, 116 S.Ct. at 1661–1662).

Officer Limoges testified that he heard Bracknell say he had a pocketknife and saw him indicate that the pocketknife was inside the left side of his pants. His body camera video, which shows Bracknell gesturing to his front left pocket, corroborates his testimony. The evidence does not demonstrate that a mistake by Limoges, if one occurred, was unreasonable.

## VI. Officer Limoges Was Justified to Search Beyond the Outer Clothing by Checking Bracknell's Pockets for a Pocketknife

In *United States v. Johnson*, 921 F.3d 991, 997 (11th Cir. 2019), the Eleventh Circuit explained that a protective search may go beyond a frisk of the outer garments when the officer reasonably believes a weapon is inside the clothing. While the court's example in *Johnson* included an officer frisking the outer garments and feeling an object he reasonably believes may be a weapon, thereby authorizing the officer to reach inside the clothing, the reason for

allowing the officer to put his hands inside a pocket is the reasonable belief it contains a weapon. "As the *Terry* Court made clear, we cannot "deny the officer the power to take necessary measures ... to neutralize the threat of physical harm." *Id.* (quoting *Terry*, 392 U.S. at 24).

Here, the reasonable belief that Bracknell possessed a weapon in his pockets was derived from Bracknell's response when asked if he had a weapon. Limoges's testimony and the body camera videos clearly establish that he conducted the protective search to find the pocketknife, focusing on the left side of Bracknell's pants. Reaching into the pockets to find the pocketknife was a necessary measure to neutralize the threat of harm. Limoges explained that the items he removed from the pockets blocked or hindered his ability to find the pocketknife, and he testified that he removed items from the pockets solely for the purpose of finding the pocketknife, and not for the purpose of discovering narcotics.

## VII. Seizure of the Non-Anatomical Bulge Discovered During the Protective Search Was Justified by Plain Feel

When an officer recognizes contraband, he cannot be required to ignore it, and may seize it under the "plain-view" doctrine. *Michigan v. Long*, 463 U.S. 1032, 1049-1050, 103 S.Ct. 3469, 3480-3481 (1983). The warrantless seizure of contraband discovered in "plain view" is justified when its incriminating character is immediately apparent. *Horton v. California*, 496 U.S. 128, 136-137,

110 S.Ct. 2301, 2308 (1990). The plain view doctrine applies to the discovery of contraband through the sense of touch during an otherwise lawful search, and seizure of contraband without a warrant is justified under such circumstances. *Dickerson*, 508 U.S. at 374-375.

Here, the evidence established that Officer Limoges, through plain feel, immediately recognized the methamphetamine when he touched the "non-anatomical bulge." Limoges's reaction and statements when he touched it ("What is that?") and immediately thereafter ("I'm searching these things further 'cause there's something inside the left side of his pocket. Right here."), captured in the recording from his body camera video, corroborate his testimony that he immediately recognized the item to contain methamphetamine when he touched it. He was therefore justified in seizing it.

Bracknell asks the Court to disregard Limoges's testimony by suggesting it was inconsistent with prior statements. But no inconsistencies were revealed during the hearing, and for good reason—the prior statements are not inconsistent. In his report, Limoges wrote: "I then continued to pat Mr. Bracknell and felt a large non anatomical bulge within his crotch area, and upon feeling the contraband, Mr. Bracknell attempted to pull away from me." (The report referenced by Bracknell in Doc. 49 at ¶ 14, which was not previously part of the record, is attached to this Reply.) And during his

deposition, Limoges was not asked any questions regarding what he felt when he touched the item. (The deposition was previously included in the record at Doc. 28-3.)

## VIII. The Methamphetamine Was Not "Fruit of the Poisonous Tree" and Inevitably Would Have Been Discovered

As previously noted, Officer Limoges had a reasonable belief that Bracknell was armed and dangerous, he was lawfully authorized to conduct a protective search to find weapons, and it was reasonable for him to put his hand in Bracknell's pockets to find the pocketknife he believed Bracknell possessed. Assuming, *arguendo*, that reaching into Bracknell's pockets exceeded the scope of a valid protective search for weapons, the methamphetamine should not be suppressed as "fruits of the poisonous tree" because the discovery of the methamphetamine was not caused by the search of a pocket. The apt question in a "fruit of the poisonous tree" analysis is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. U.S.*, 371 U.S. 471, 488 (1963) (quoting Maguire, Evidence of Guilt, 221 (1959)). It generally involves a pragmatic evaluation of the extent of the causal connection, and a sufficient causal connection is not merely a "but for" cause. *U.S. v. Bailey*, 691 F.2d 1009, 1013 (11th Cir. 1982).

Here, the causal connection does not even satisfy a "but for" analysis. The sock containing the methamphetamine was not inside a pocket; it was concealed under Bracknell's pants and underwear. And while one of Limoges's fingers through which he felt the "non-anatomical bulge" was inside the front left pocket, Limoges also detected the methamphetamine through his index finger, which was outside the pocket.

Furthermore, the touching of the item occurred during a lawful protective search that had commenced, and the methamphetamine was found concealed in a location that is checked in a typical *Terry* frisk. The officers began the process of a routine protective search by 1) advising Bracknell that they were conducting a narcotics investigation and providing *Miranda* warnings, 2) positioning Bracknell near Chimeri's vehicle and taking positions behind and on both sides of Bracknell, and 3) asking Bracknell if he possessed a weapon.

Evidence may be admissible if the government proves by a preponderance of the evidence that the evidence would ultimately have been discovered through lawful means. *United States v. Watkins*, 10 F.4th 1179, 1180-85 (11th Cir. 2021). Here, had Officer Limoges not believed that Bracknell said he had a pocketknife in his pants, the evidence would have been discovered through a standard outer garment patdown for weapons. The evidence in this

case proved, by at least a preponderance of the evidence, that the officers were actively pursuing a narcotics investigation, part of that investigation included conducting a protective search with a frisk for weapons, a typical outer garment search would have included the area where the methamphetamine was concealed, and the methamphetamine would have been discovered by plain feel.

## IX. The Exclusionary Rule Should Not Be Applied

A Fourth Amendment violation does not necessarily require the application of the exclusionary rule; suppression of evidence is not constitutionally required, and it is not an automatic remedy for any law enforcement error. *Herring v. United States*, 555 U.S. 135, 140 (2009). Suppression of evidence is a judicially created remedy that applies only where it results in appreciable deterrence. *Id*. at 141. Before employing it, courts must weigh its benefits and costs and conclude that the former outweighs the latter. *Id.* "The sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37 (2011). Without intentional misconduct or "systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not pay its way." *Herring*, 555 U.S. at 147–48.

Here, suppression of evidence would not be justified and would not result in appreciable deterrence unless the Court finds that Officer Limoges acted in bad faith or in reckless disregard of constitutional requirements. But the evidence does not indicate bad faith or reckless disregard; to the contrary, the testimony of the officers and the evidence from the videos support a finding that Officer Limoges acted in good faith and with the reasonable belief that Bracknell possessed a weapon when he placed his hand in the pockets on the left side of Bracknell's pants.

## CONCLUSION

For the foregoing reasons, the defendant's motion should be denied.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By: */s/ Michael C. Sinacore*
Michael C. Sinacore
Assistant United States Attorney
Florida Bar No. 868523
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6396
Facsimile: (813) 274-6178
E-mail: michael.sinacore@usdoj.gov

**U.S. v. Michael Phillip Bracknell Case No. 8:26-cr-139-KKM-AEP**

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

*/s/ Michael C. Sinacore*
Michael C. Sinacore
Assistant United States Attorney
Florida Bar No. 868523
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6396
Facsimile: (813) 274-6178
E-mail: michael.sinacore@usdoj.gov