**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,

v. Case No. 8:26-cr-139-KKM-AEP

MICHAEL PHILLIP BRACKNELL,

Defendant.

---

# ORDER

Officers discovered methamphetamine on Michael Bracknell after a warrantless traffic stop, canine alert to his electric scooter, and pat-down. Based on that recovered methamphetamine, a grand jury indicted Bracknell for possession of fifty grams or more of methamphetamine with intent to distribute. *See* Superseding Indictment (Doc. 18) at 1. Bracknell moves to suppress all evidence obtained from the stop. Mot. to Suppress (MTS) (Doc. 25); Suppl. Mot. to Suppress (Suppl. MTS) (Doc. 49); *see* FED. R. CRIM. P. 12(b)(3)(C). The government opposes, arguing that both the stop and the search were reasonable because the traffic stop was justified, that the canine sniff did not prolong the traffic stop, that the officers reasonably conducted a protective search of Bracknell, that the officer who searched plainly felt methamphetamine hidden under Bracknell's shorts, and, regardless, that the methamphetamine would have inevitably been discovered. *See* Resp. (Doc. 34);

Suppl. Resp. (Doc. 50). After holding an evidentiary hearing, I deny Bracknell's motion because the government justified the stop and search.

## I. FINDINGS OF FACT

An assessment of both the evidence presented and the credibility of the witnesses at a September 28, 2026 evidentiary hearing yields the following findings. *See United States v. Joseph*, 978 F.3d 1251, 1262 (11th Cir. 2020) (recognizing that the district-court judge acts as the factfinder concerning a motion to suppress).

On May 15, 2025, three Zephyrhills Police Department officers, Officers Upchurch, Limoges, and Chimeri, who worked on a "special response team" focused on removing "narcotic[s]" from the street, *see* Transcript at 8:8–22, observed Bracknell "fail to stop" at four different stop signs while driving an electric scooter. Chimeri Dep. (Doc. 28-2) at 10:6–15; Upchurch Dep. (Doc. 28-1) 7:21–8:20; Transcript at 9:21–13:2. The officers recognized Bracknell because of his "prior narcotics conviction." Transcript at 12:7–11, 89:23–90:1, 124:19–125:10.

At 3:41 p.m., the officers pulled Bracknell over on a dead-end road. *See* Officer Upchurch Dashcam (Ex. 1) at 15:41:57–15:42:05. The officers selected that spot because Bracknell had fled from law enforcement in the past and posed a flight risk. *See* Transcript at 69:11–23. At 3:42 p.m., Officer Limoges, who had been patrolling with Officers Upchurch and Chimeri, arrived as

backup. Transcript at 76:16–77:2. Officer Upchurch approached Bracknell, telling him that the officers stopped him because "[Bracknell] ran a whole bunch of stop signs." *See* Upchurch Bodycam (Ex. 2) at 15:42:12–51; Chimeri Bodycam (Ex. 4) at 15:42:20–51. Bracknell protested that he failed to stop because he took the signs to be yield signs. Transcript at 80:11–15. After discussing with Bracknell where he should rest the scooter and reiterating that Bracknell had been stopped for running stop signs, Bracknell dismounted, leaned the scooter against a power pole support wire, and walked towards the officers' pickup truck at 3:44 p.m. Upchurch Bodycam at 15:42:54–44:45; Chimeri Bodycam at 15:42:54–44:40. At 3:45 p.m., Officer Chimeri radioed in to request information about Bracknell. Chimeri Bodycam at 15:44:42–45:30; Transcript at 70:13–72:12. Officer Chimeri continued to pull Bracknell's information for the traffic stop from his computer, while he waited for a response to a "wants and warrants check." Chimeri Bodycam at 15:45:30–46:27; Transcript at 77:17–78:23.

As Officer Chimeri conducted the traffic stop, Officer Limoges deployed his canine partner, Woody, to sniff Bracknell's scooter for narcotics. Limoges Bodycam (Ex. 5) at 15:44:40. At that time, Woody was certified to detect the scent of narcotics, including methamphetamine. Transcript at 97:25–98:15. At 3:44 p.m., Officer Limoges leashed Woody and removed him from the vehicle. Limoges Bodycam at 15:44:40–58. At 3:45 p.m., Woody began an open-air sniff

around the scooter. *Id.* at 15:44:11–45:26; Transcript at 101:17–103:17. Officer Limoges testified, and his body-camera footage supports, that Woody alerted to the scent of narcotics on Bracknell's scooter. Limoges Bodycam at 15:44:11–45:26; Transcript at 101:17–103:17, 139:10–141:15. By 3:46 p.m., Woody returned to the vehicle. Limoges Bodycam at 15:45:59. At that same time, Officer Chimeri was still waiting for the wants and warrants check to come back. *See* Chimeri Bodycam at 15:45:30–46:27; Transcript at 77:17–78:23. Based on this timeline, the traffic stop began at 3:41 p.m. and the canine sniff started at 3:44 p.m. and ended at 3:46 p.m. before the traffic stop concluded. As such, the canine sniff did not interfere with or prolong the traffic stop.

After Woody alerted, the stop shifted into a narcotics investigation. *See* Transcript at 64:19–22. At that point, Officer Limoges walked over to Officer Chimeri—who was still processing Bracknell's information for the traffic stop—and told Officer Chimeri, "you are good." Officer Chimeri understood that statement to mean that Woody alerted to the smell of narcotics. Transcript at 101:17–103:17; Chimeri Bodycam at 15:46:27–36. Officer Chimeri then informed Bracknell that Woody alerted to the scent of narcotics and read Bracknell a *Miranda* warning. Chimeri Bodycam at 15:47:28–48:06. Based on Bracknell's history and Officer Limoges' experience that, often, "drugs come[] [with] weapons," Transcript at 62:24–63:20, he prepared to pat-down Bracknell to ensure the officers remained safe throughout the narcotics investigation.

Officer Chimeri then instructed Bracknell, who was standing next to the officers, to place his hands on the hood of the truck. Chimeri Bodycam at 15:48:06–10.

Before patting Bracknell down, Officer Limoges asked Bracknell whether Bracknell had "anything on [him] that would poke[], stick[], or hurt [Officer Limoges]." Limoges Bodycam at 15:48:10–13; Transcript at 107:4–7. Bracknell muttered something in response, nodded to his left, and patted his left-front-cargo-shorts pocket. Limoges Bodycam at 15:48:12–14; Transcript at 18:23–19:18, 27:16–28:22, 107:8–108:7. Bracknell's verbal response, as recorded on Officer Limoges' Bodycam, is unintelligible. The sound of the running truck that Bracknell is leaned against combined with Bracknell's accent and manner of speaking render it almost impossible to decipher from the recording what Bracknell says. *See* Transcript at 150:6–8. Officer Limoges understood Bracknell to say, as Bracknell gestured towards his left side and patted his left pocket, that "I have got a pocketknife." Transcript at 107:9–108:7; *see also* Suppl. MTS at 5 (offering that Bracknell stated "[n]o I ain't got a pocket knife or nuthin" in response to the question).[1] At that, Officer

[1] At some point, the government ordered transcripts of Officer Limoges' bodycam footage from an unidentified third party. *See* Transcript at 117:21–118:24. That transcript reports that Bracknell stated in response to Officer Limoges' question, "No. Not – F***in' nothing, no." *See* Limoges Transcript (Doc. 45-3). Officer Limoges maintained at the hearing that Bracknell stated that he had a pocketknife, regardless of the transcript. Transcript at 107:11–16. Because "video evidence . . . speaks for itself," I place little to no weight on this transcript. *See Edger v. McCabe*, 84 F.4th

Limoges—understanding Bracknell's response to mean that he had a knife—began the pat-down search, focusing on his left side. Limoges Bodycam at 15:48:15; Transcript at 117:16-19.

Officer Limoges first patted down the left side of Bracknell's shorts, where Bracknell had gestured. Limoges Bodycam at 15:48:15–21. He felt objects inside. *Id.* So Officer Limoges began removing various items—a wallet, a film canister, and a sealable plastic bag—from Bracknell's left-side pockets to find the pocketknife that Limoges understood Bracknell to be carrying. *Id.* at 15:48:22–49:35. Bracknell identified the film canister as containing "Viagra," the common name for sildenafil. *Id.* at 15:48:39–42. The officers looked in the canister. *Id.* Bracknell kept fidgeting as Limoges searched. *Id.* at 15:48:22–49:35.

Still finding no knife, Officer Limoges kept searching Bracknell's left-front pocket. Officer Limoges placed two fingers inside the pocket and kept two fingers outside the pocket. Transcript at 132:14–135:11. With his fingers touching both the interior and exterior of Bracknell's shorts, Officer Limoges felt "a bag of . . . methamphetamine rocks" in Bracknell's left thigh and groin area. Limoges Bodycam at 15:49:30–35; Transcript at 109:9–110:12, 132:14–

---

1230, 1237 (11th Cir. 2023). Bracknell's own version of his statements differs from the transcript too, offering that he stated "[n]o I ain't got a pocket knife or nuthin" in response. *See* Suppl. MTS at 5.

135:11. Given his training and experience, Officer Limoges could immediately tell that this object contained methamphetamine from that initial touch. Transcript at 110:4–12. Officer Limoges then asked Bracknell, "what is that," but at the question, Bracknell jolted, requiring the officers to handcuff him. Limoges Bodycam at 15:49:33–51. Officer Limoges then stated, "there's something inside of his left side pocket, right here," and placed his hand over the same area. *Id.* at 15:49:45–51. Officer Limoges again felt the rocks when he placed his hand to pat down the outside of Bracknell's shorts and a third time when he placed his hand back inside Bracknell's pocket. *Id.* at 15:49:48–50:04. In response, Bracknell pushed himself away from Officer Limoges and into the truck; Officer Limoges told Bracknell to stop pulling away and that he "felt" the rocks. *Id.* at 15:49:48–50:12. Officer Limoges again asked Bracknell if "[he] had something tied right [under his shorts]." Limoges Bodycam at 15:50:23–25. Getting no response, Officer Limoges loosened Bracknell's belt, and removed a stuffed sock hidden beneath Bracknell's shorts, placing it on the truck hood. *Id.* at 15:50:23–32.

Officer Chimeri likewise felt that the sock contained crystal methamphetamine rocks based on his training and experience. Transcript at 81:6–23. He then removed its contents, revealing a plastic bag containing a white crystalized substance. Chimeri Bodycam at 15:50:30–52. The substance tested positive for methamphetamine. Transcript at 81:6–10. Upon finding the

methamphetamine, the officers arrested Bracknell and retrieved all the items on his person. After completing their search, the officers never found a knife on Bracknell. Transcript at 93:7–12.

Although Officer Limoges first felt the methamphetamine when searching in Bracknell's left pocket, Officer Limoges credibly testified—and his fellow officers credibly corroborated—that Officer Limoges had started and would have performed an ordinary pat-down of Bracknell before reaching inside Bracknell's pockets if Officer Limoges had not understood Bracknell to communicate that he had a knife in his left-side pocket and felt the objects in that pocket. Transcript at 15:22–18:3, 32:21—34:24, 81:19–83:8, 95:17–96:6, 106:9–107:7, 136:8–137:2, 138:11—139:9. As part of that pat-down, Officer Limoges would have first patted-down Bracknell's appendix or groin area—the same place that Officer Limoges later felt the methamphetamine rocks from the outside of Bracknell's shorts. *Id.* The officers testified that they ordinarily begin in that area because it is the most common place for individuals to keep weapons. *Id.* In short, Officer Limoges would have patted down and felt the methamphetamine rocks even if he had never partially reached into Bracknell's pocket. *Id.*

## II. LEGAL STANDARD

The Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures," *see* U.S. CONST. amend IV, including

unreasonable traffic stops, *see Whren v. United States*, 517 U.S. 806, 809–10 (1996), and unreasonable frisks, *see United States v. Johnson*, 921 F.3d 991, 997 (11th Cir. 2019) (en banc) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Under the Fourth Amendment, an unreasonable search or seizure "can trigger the exclusionary rule, which requires courts to suppress illegally obtained evidence." *United States v. Watkins*, 13 F.4th 1202, 1210 (11th Cir. 2021). The defendant ordinarily bears the burden on a motion to suppress evidence, but when an officer conducts a warrantless search, "the burden shifts to the government to justify" the search, *see United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977),[2] by a "preponderance of the evidence," *see United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## III. ANALYSIS

Bracknell argues that the evidence from the warrantless traffic stop and subsequent search should be excluded. His arguments divide into three buckets. First, he contends that the traffic stop was an unlawful seizure because the officers lacked reasonable suspicion that a traffic violation had occurred. MTS at 7–9; Suppl. MTS at 20–22. Second, even if the stop was lawful, Bracknell argues that the officers impermissibly extended the stop to

[2] The Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit before September 30, 1981. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

permit a canine sniff of his scooter and that the canine never alerted to narcotics. MTS at 9–11; Suppl. MTS at 21–23. Third, setting everything else aside, Bracknell argues that the officers unreasonably removed methamphetamine and other items because the officers lacked reasonable suspicion needed for a protective search, the officers had no plain feel justification, the pocket-by-pocket search exceeded any protective purpose, and the officers would not have inevitably discovered the methamphetamine. *See generally* MTS; Suppl. MTS. After taking each objection in turn, I conclude that the officers were justified in stopping and searching Bracknell and seizing the contraband.

### A. The Officers Had Reasonable Suspicion of a Traffic Violation

A traffic stop implicates Fourth Amendment protections against unreasonable seizures. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015). An officer may initiate a traffic stop when he has a "reasonable suspicion" that a traffic violation occurred. *See United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022) (en banc) (citation omitted). "Observation of a traffic violation" establishes reasonable suspicion "to conduct a traffic stop." *See United States v. Johnson*, No. 24-14083, 2026 WL 84476, at *4 (11th Cir. Jan. 12, 2026) (citing *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008)). An officer's subjective motivations for a stop do not alter the reasonableness of the stop either. *See Whren*, 517 U.S. at 813. And even "minor

traffic violations"—like running a stop sign—count. *See Campbell*, 26 F.4th at 880.

The officers here had reasonable suspicion to perform the traffic stop. Under Florida law, "every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop," Fla. Stat. § 316.123, including electric scooter drivers, *see* Fla. Stat. § 316.003(109) (defining vehicle as "[e]very device . . . by which any person or property is or may be transported or drawn upon a street or highway"). Given that the officers saw Bracknell commit four traffic violations, they had reasonable suspicion to stop him. *See* Transcript at 9:15–10:13, 67:18–68:10; *see also* Chimeri Dep. at 10:6–15; Upchurch Dep. 7:21–8:19.

Bracknell objects that the stop was unlawful because the officers' observations that Bracknell failed to stop are not credible and that an otherwise-lawful traffic stop conducted by an officer who subjectively hopes to find evidence of narcotics converts the stop into an unlawful one. Both arguments fail. Officers Upchurch and Chimeri credibly testified to observing Bracknell's failure to stop at multiple stop signs while driving an electric scooter. *See* Transcript at 9:15–10:13, 67:8–68:10; *see also* Chimeri Dep. at 10:6–15; Upchurch Dep. 7:21–8:19. That testimony alone establishes the stop's reasonableness. But Bracknell's own admission once pulled over that he failed to stop because he thought the stop signs were instead yield signs further

bolsters the officers' testimony. Transcript at 80:11–15. And because the officers had an objective basis to stop Bracknell, that forecloses Bracknell's argument that the subjective "motivations of the individual officers" to find narcotics somehow undermine "the constitutional reasonableness of [the] traffic stop[.]" *See Whren*, 517 U.S. at 813 (rejecting such an argument). In short, the traffic stop itself presents no Fourth Amendment violation.

**B. The Canine Sniff Did Not Prolong the Traffic Stop**

In general, "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop" does not violate the Fourth Amendment. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005). But when an officer takes more time than reasonably required to complete the traffic stop to allow for a canine sniff, the initial seizure becomes unlawful. *See Rodriguez*, 575 U.S. a t350–51; *Campbell*, 26 F.4th at 884. The Eleventh Circuit has "recognize[d] five tasks" as falling within a traffic stop's "legitimate mission: (1) issuing a warning ticket; (2) running a check for outstanding warrants; (3) checking [a driver's] license; (4) checking insurance; and (5) checking registration." *See Baxter v. Roberts*, 54 F.4th 1241, 1260 (11th Cir. 2022) (citation omitted); *United States v. Braddy*, 11 F.4th 1298, 1310 (11th Cir. 2021). When a canine sniff "adds [no] time" to the stop's original traffic-related tasks, the stop remains lawful. *Campbell*, 26 F.4th at 884 (citing *Rodriguez*, 575 U.S. at 356).

Nothing about the canine sniff prolonged the traffic stop of Bracknell. The traffic stop began at 3:41:57 p.m. when Officer Upchurch pulled Bracknell over and lasted until 3:46:46 p.m. when Officer Chimeri stopped running the outstanding warrants check to begin the narcotics investigation. The canine sniff occurred entirely within that window. At no point did Officer Limoges interfere with the traffic stop. Nor did Officer Chimeri drag out his interactions with Bracknell; immediately after having Bracknell stand by the truck, Officer Chimeri got to work on "running a check for outstanding warrants"—a textbook traffic stop-related task. *See Baxter*, 54 F.4th at 1260. If anything, the officers were careful to keep the traffic-related tasks running—without interruption—while Officer Limoges conducted a canine sniff. So, Officer Limoges handling of Woody did not unlawfully prolong the stop. *See Rodriguez*, 575 U.S. at 350–51; *Campbell*, 26 F.4th at 884.[3]

[3] Although Bracknell argues that Officer Limoges bodycam footage contradicts that Woody ever alerted to narcotics or reliably alerted to narcotics, *see* Suppl. MTS 18–19, I find that Officer Limoges credibly testified to the alert and that the bodycam footage supports that Woody alerted to narcotics, without any evidence to undermine the authenticity of the alert, *see Braddy*, 11 F.4th at 1314–15. Because I find that alert authentic, as explained below, it contributed to the totality of the circumstances justifying the *Terry* frisk and it independently provided "probable cause" for a narcotics investigation of the scooter. *See United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006).

### C. The Officers had Reasonable Suspicion for a Pat-Down to Ensure Officer Safety and Officer Limoges Reasonably Searched Bracknell's Pocket

"When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed," the officer may "take necessary measures to determine whether the person is in fact carrying a weapon." *See Terry v. Ohio*, 392 U.S. 1, 24 (1968) (providing the reasonable-suspicion standard); *United States v. White*, 593 F.3d 1199, 1202 (11th Cir. 2010) (explaining that an officer may frisk a person incident to a lawful stop "if he has reason to believe that his own safety or the safety of others is at risk"). Reasonable suspicion for a pat-down is based on the totality of the circumstances. *United States v. Johnson*, 921 F.3d 991, 998 (11th Cir. 2019) (en banc). Facts that can contribute to a reasonable suspicion that a suspect is armed include the presence of narcotics in the same area as the defendant, *see United States v. Terzado-Madruga*, 897 F.2d 1099, 1120 (11th Cir. 1990) (explaining the close connection between drugs and weapons), the suspect's "known criminal history," *see Bishop*, 940 F.3d at 1249, the "suspect's reaction" to the officers, *see United States v. Turner*, 684 F. App'x 816, 821 (11th Cir. 2017) (citation omitted), including the suspect's response to officer questions, and the reality "that traffic stops are especially fraught with danger to police officers," *see Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (citation omitted). If an officer forms reasonable suspicion, in part, on a mistaken but "reasonable"

misunderstanding of a fact, that mistaken fact can still support reasonable suspicion. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003); *Heien v. North Carolina*, 574 U.S. 54, 61 (2014). At bottom, officers need not have "absolute certainty," but may employ "common sense" to form a reasonable suspicion that a suspect is armed. *See Bishop*, 940 F.3d at 1250 (citation omitted).

Contrary to Bracknell's arguments, *see* MTS at 11–14; Suppl. MTS at 9–12, the officers were objectively justified in patting Bracknell down to ensure their safety. In response to Officer Limoges' question "do you have anything that will poke me, stick me, or hurt me," Officer Limoges understood Bracknell to say that he had a knife, saw Bracknell nod his head to his left side, and watched Bracknell pat his left shorts pocket. Limoges Bodycam at 15:48:10–13; Transcript at 107:3–7. Even if Bracknell said "[n]o I ain't got a pocket knife or nuthin," *see* Suppl. MTS at 5, given Bracknell's head nod to the left and pat on his left side, the roar of the truck engine, the purported mention of a pocketknife, and Bracknell's muddled speech, Officer Limoges, at minimum, reasonably mistook Bracknell to say that he had a pocketknife. Limoges Bodycam at 15:48:10–14. Although Bracknell's speech is not readily discernible on the bodycam video, his conduct is unmistakable. *Id.* Beyond that, Bracknell's known history of methamphetamine possession, fleeing the police, and Woody's alert to the scent of narcotics where Bracknell had been standing

minutes before, added to the likelihood that Bracknell carried a weapon given the well-established connection between drugs and guns. *See Castillo v. United States*, 200 F.3d 735, 737 n.2 (11th Cir. 2000) (explaining that it is reasonable to suspect that an individual carrying drugs is armed because weapons are "the tools of the [drug] trade") (citation omitted). All these circumstances together support, and "common sense" dictates, that Officer Limoges was justified in patting Bracknell down. *See Bishop*, 940 F.3d at 1250.

Given these facts, Officer Limoges was also justified in reaching inside Bracknell's left-side pockets and removing the items within as a "necessary" measure to locate the knife that Officer Limoges understood Bracknell to possess. *See Terry*, 392 U.S. at 24; *Johnson*, 921 F.3d at 997. Upon patting Bracknell down, Officer Limoges felt objects that could conceal a knife from plain feel. Because Bracknell had patted his left side when Officer Limoges understood Bracknell to say that he had a pocketknife, reaching into Bracknell's left-side pockets to remove "concealed object[s]" was "reasonably related to the protection of the officers." *Johnson*, 921 F.3d at 997, 1000. Simply, Officer Limoges "acted reasonably" in searching Bracknell's left-side pockets to find a knife he thought Bracknell told him Bracknell was carrying. *Id.* at 1000; *see also* Suppl. MTS at 10 (conceding that if the knife statement is accepted, the interior pocket search is reasonable).

### D. Officer Limoges Reasonably Seized the Methamphetamine Based on Plain Feel

When an officer conducts a reasonable *Terry* search, within the scope of that search, if the officer also "feels an object whose contour or mass makes its identity immediately apparent" as "contraband," then the officer is "justified" in seizing the item. *See Minnesota v. Dickerson*, 508 U.S. 366, 375–76 (1993). This means that "tactile discoveries of contraband" are permitted if they occur during a lawful search. *Id.*; *see also United States v. Borne*, 239 F. App'x 185, 187 (6th Cir. 2007) (upholding a trial court's order that applied plain feel doctrine to methamphetamine based on an officer's experience).

Officer Limoges reasonably felt and seized the methamphetamine from Bracknell because, as he credibly testified, he plainly felt the methamphetamine rocks while performing the protective search. Transcript at 110:4–12, 132:14—135:11; Limoges Bodycam at 15:49:48–50:04. Bracknell's argument on this point amounts to offering that the officers only felt the methamphetamine contraband after the protective search ended. *See* MTS at 14. But the record contradicts that narrative. After patting down Bracknell's left-side pockets and beginning his search for the purported knife (in response to Bracknell gesturing and patting his left side), Officer Limoges first felt the rocks when he reached inside Bracknell's left-front pocket, as part of the protective search. Still finding no knife, Officer Limoges patted-down the

outside of Bracknell's shorts and felt the rocks a second time while continuing the protective search. Because Officer Limoges felt and realized that the rocks were methamphetamine while "acting within the lawful bounds" of the protective search, *Dickerson*, 508 U.S. at 377, he seized the methamphetamine from Bracknell consistent with the Fourth Amendment's protection against unreasonable searches.

### E. The Methamphetamine (and Other Items) Would Have Been Inevitably Discovered

Even when a search might otherwise result in a Fourth Amendment violation, if an exception applies, the violation cures, and the search proves reasonable. *See United States v. Watkins*, 10 F.4th 1179, 1180 (11th Cir. 2021). One such exception controls whenever evidence improperly obtained "would ultimately have been discovered through lawful means" if the constitutionally problematic act had not occurred. *Id.*; *see also Utah v. Strieff*, 579 U.S. 232, 238 (2016) ("[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source."). To invoke that exception, "the government must also demonstrate that before the unlawful activity occurred, it was actively pursuing the lawful means that would have rendered discovery inevitable." *See McKathan v. United States*, 969 F.3d 1213, 1232 (11th Cir. 2020).

Although Officer Limoges reasonably searched Bracknell's pocket, even if Officer Limoges had improperly searched inside Bracknell's left-side pockets, the methamphetamine would have still been lawfully recovered, Bracknell arrested, and a search performed for all the items on Bracknell incident to arrest. *See Watkins*, 10 F.4th at 1180; *Birchfield v. N. Dakota*, 579 U.S. 438, 460 (2016) (incident to arrest doctrine). As explained by the officers' credible testimony, Officer Limoges had engaged the pat-down process before entering Bracknell's pocket. Transcript at 15:22–18:3, 32:21–34:11, 81:19–83:8, 95:17–96:6, 106:9–107:7, 136:8–137:2, 138:11–139:9. Officer Limoges departed from that process only because Bracknell's indication he had a pocketknife in his left-side pocket and the realization that items were, in fact, in that pocket after patting the pocket compelled Officer Limoges to check inside the pocket first. *Id.* at 133:17–134:2. As a part of the protocol for that already initiated pat-down, Officer Limoges would have would have patted-down the appendix, thigh, or groin area where Bracknell stored the methamphetamine—because that's the most common location for weapons in the officers' experience. *Id.* at 15:22–18:3, 32:21–34:11, 81:19–83:8, 95:17–96:6, 106:9–107:7, 136:8–137:2, 138:11–139:9. In patting down that area, Officer Limoges would have plainly felt the methamphetamine rocks that Bracknell had hidden in that area, as Officer Limoges credibly testified that he plainly felt the rocks when patting down the exterior of Bracknell's shorts in that same area. *Id.*; *Id.* at 109:15–

110:12, 134:21–135:11, 134:23–139:9; Limoges Bodycam at 15:49:48–50:04. In short, even if Officer Limoges had never reached inside Bracknell's shorts pockets, he still would have lawfully discovered the methamphetamine. And because upon the discovery of methamphetamine Bracknell would have been arrested—as he was here—then all the other items in Bracknell's possession would have been lawfully uncovered incident to that arrest. *See Birchfield*, 579 U.S. at 460.[4] Together, these facts support that even if the internal pocket search was unreasonable, all the items Bracknell moves to suppress would have been lawfully recovered as a result of an ordinary pat-down and thus any Fourth Amendment defect is cured under the inevitable-discovery doctrine.[5]

## IV. CONCLUSION

Because the officers reasonably stopped and searched Bracknell, leading to the recovery of the methamphetamine and other items found on Bracknell's person, I decline to suppress the evidence Bracknell challenges.

---

[4] Bracknell argues in passing that his spontaneous statement—following *Miranda* warnings—that the film canister contained "Viagra" should be suppressed as well. *See* MTS at 14. But that argument fails, as that statement was voluntary. *See United States v. McKenzie*, 132 F. App'x 788, 789 (11th Cir. 2005) ("[V]oluntary statements—even those made without a *Miranda* reading—are admissible.").

[5] Because the canister holding the Sildenafil would have been inevitably and lawfully searched incident to arrest, I need not consider whether opening the film canister violated the Fourth Amendment, as any violation on those grounds is cured. Whether the government may introduce evidence of the canister's contents at trial is a separate question that I do not resolve here.

Accordingly, Bracknell's Motion to Suppress (Doc. 25) and Supplemental Motion to Suppress (Doc. 49) are **DENIED**.

**ORDERED** in Tampa, Florida, on November 3, 2026.

Kathryn Kimball Mizelle
United States District Judge